1  GREGORY K. JONES, State Bar No. 181072
    gjones@stradlinglaw.com
2  STRADLING YOCCA CARLSON & RAUTH LLP
   10100 N. Santa Monica Blvd., Suite 1450
3  Los Angeles, CA 90067
   Telephone:  424-214-7000
4  Facsimile:  424-214-7010

5  Proposed Counsel for Debtor
   GRDN Hospitality, LLC
6

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DIVISION OF CALIFORNIA**

10                **LOS ANGELES DIVISION**

| | |
|---|---|
| 11  In Re : | Case No. 2:25-bk-16321-DS |
| 12  GRDN Hospitality, LLC, d/b/a Three Weavers Brewing Company, | Chapter 11 |
| 13                            Debtor. | **EMERGENCY MOTION FOR AUTHORITY TO USE CASH COLLATERAL ON AN INTERIM AND FINAL BASIS; DECLARATION OF NICOLE TORRES IN SUPPORT THEREOF; EXHIBITS** |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | Date:   [To Be Scheduled] Time: |
| 19 | Place: 255 East Temple Street          Los Angeles, CA 90012 Courtroom:  1639 |
| 20 | |

21

22

23

24

25

26

27

28

STRADLING YOCCA
CARLSON & RAUTH

## SUMMARY

Pursuant to Rules 2081-1(a)(9), 4001-2 and 9075-1(a) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "Local Rules"), 11 U.S.C. §§ 361, 363(c), and 364 and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, GRDN Hospitality, LLC (the "Debtor"), a California limited liability company and debtor and debtor in possession in the above-captioned case hereby moves (the "Motion") on an emergency basis for entry of an order (i) authorizing the Debtor to use cash collateral on an emergency interim basis pending a final hearing and (ii) setting a final hearing on the Motion.  The relief requested in this Motion is based on the memorandum of points and authorities attached hereto and the Declaration of Nicole Torres (the "Torres Declaration"), also attached hereto.

In its reasonable business judgment, the Debtor has determined that it was in its best interest to file for subchapter V bankruptcy protection and preserve the going concern value of its business.  To keep the Debtor operating through confirmation of a plan of reorganization, the Debtor needs the use of cash collateral.

In support of the Motion, the Debtor has proposed a budget (the "Budget"), which is attached to the Torres Declaration as Exhibit C.  The Budget reflects the Debtor's ordinary and necessary operating expenses that must be paid post-petition to preserve the Debtor's company.  The needs of the business may fluctuate, however, so the Debtor requests approval to deviate from the total expenses contained in the Budget by no more than fifteen percent (15%), on a cumulative basis, and to deviate by category without the need for further Court order.

The Debtor's secured creditor is Live Oak Bank (the "Bank") pursuant to an SBA 7(a) "Loan Agreement" (the "Live Oak Agreement") and a related letter of credit.  As set forth below, Live Oak is protected by the Debtor's continued management and operation of the going concern value of the Debtor's business.

1    Further, the Debtor is proposing replacement liens on the Debtor's cash to the

2    same extent, priority, and validity as existed on the Petition Date (as defined

3    below).

4         If the Debtor is unable to use cash collateral, it will be unable to operate, pay

5    employees or insurance, and the overall value of the business will be lost with no

6    meaningful recovery for creditors.

7                              **APPLICABLE AUTHORITIES**

8         This Motion is based upon Local Rules 2081-1(a)(9), 4001-2, and 9075-1(a),

9    11 U.S.C. §§ 361 and 363(c), and Bankruptcy Rules 4001 and 9014, the supporting

10   Memorandum of Points and Authorities annexed hereto and the Torres

11   Declaration, as well as the arguments and statements of counsel to be made at the

12   hearing on the Motion, and other admissible evidence properly brought before the

13   Court.

14        The Debtor submits that the setting of the hearing on this Motion on an

15   emergency basis is warranted given the critical need to fund operations of active

16   operations.  Pursuant to Bankruptcy Rule 4001(b)(2), the Court may conduct a

17   preliminary hearing before such fourteen-day period expires to enable the Debtor

18   to use cash collateral as is necessary to avoid immediate and irreparable harm to

19   the estate pending a final hearing.

20        In order to provide maximum notice of this Motion, concurrently with the

21   filing of this Motion with the Court, the Debtor served by overnight mail a copy of

22   this Motion and all supportive papers upon the Office of the United States Trustee,

23   Live Oak, the State of California taxing agencies with alleged tax liens on the

24   Debtor's property, and the 20 largest unsecured creditors in the Debtor's case.

25        **WHEREFORE**, the Debtor respectfully requests that this Court enter an

26   order:

27        (i)    granting the Motion on an interim basis, pending a final hearing;

28        (ii)   approving the form and scope of notice proposed by the Debtor;

STRADLING YOCCA
CARLSON & RAUTH

-2-

1

(iii)   authorizing the Debtor to use cash collateral to pay all the expenses

2

set forth in the Budget, with authority to deviate from the line items

3

contained in the Budget by not more than 15%, on a cumulative and

4

line-item basis;

5

(iv)   waiving the stay of Bankruptcy Rule 6004;

6

(v)   setting a final hearing on the Motion; and

7

(vi)   granting such other and further relief that the Court deems just and

8

proper under the circumstances.

9

10   DATED:  July 28, 2025          STRADLING YOCCA CARLSON & RAUTH
                                    LLC

11

12                                 By:  /s/ *Gregory K. Jones*
                                        Gregory K. Jones
13                                      Proposed Counsel for Debtor and Debtor
                                        in Possession
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    FACTUAL BACKGROUND

### A.    General Background

On July 24, 2025 (the "Petition Date"), the Debtor commenced this subchapter V case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtor operates an award-winning craft brewery in Inglewood, California.  The Debtor, which was founded in 2013, is the first craft brewery in Inglewood and proudly stresses the importance of promoting a positive community.  The Debtor also was the first brewery in Los Angeles County to hire a female brewmaster.  The Debtor's tasing room is near SoFi Stadium, the Forum, and the Intuit Dome.

The Debtor has approximately 12-15 core and seasonal beers on tap at all times, including Kolsch-Style lagers, IPAs, ales, porters, seltzers, and non-alcoholic beers.  The Debtor's tasting room is located at 1031 West Manchester Blvd., and customers can attend the tasting room on a first-come, first-serve basis. Customers enjoy multiple big-screen TV monitors and can order food from local food trucks.  Further, patrons can purchase core and seasonal beers (4-pack or 6-pack formats) or kegs to go.

The Debtor has suffered from a number of different factors, including a supply chain disruption (March – August 2023), inflation (2024), and a general decline in the entire craft beer industry with the shift in consumer preferences away from beer and alcohol (2021 – present).

More recently, the Debtor's owner and Chief Executive Officer was personally impacted by the January 7, 2025 fires in the Palisades area, and the tap room was shut down due to poor air quality.  In March, the Federal government's implementation of tariffs led the Debtor to forecast that wholesale prices to its

distributors would increase by 12-15%.  Additionally, the increase in minimum wage and health benefits approved by the City of Los Angeles will cause wage inflation and employee retention issues.  Finally, the recent June 7, 2025 ICE raids significantly deterred the Debtor's customers from visiting the tap room, and those customers have not returned.

The Debtor is considering a number of reorganization options, including the potential renegotiation of its existing lease and/or to keep the Three Weavers brand alive by contracting with other entities in the brewing industry.

B.    Cash Collateral Issues

As of the Petition Date, the Debtor was a party under an "Loan Agreement" (the "Loan") with Live Oak Banking Company dated September 22, 2022.  The Loan was in the amount of $2,520,000 and an SBA 7(a) Loan.  A true and correct copy of the Loan is attached to the Torres Declaration as Exhibit "A". Additionally, the Debtor and Live Oak entered into an SBA Express Line of Credit in the amount of $200,000 (the "LOC").  A true and correct copy of the Note evidencing the LOC is attached to the Torres Declaration as Exhibit "B".  The Loan and are LOC are secured by, among other things, "all of Borrower's . . . assets, howsoever arising, wherever located and whether now owned or existing or hereafter existing or acquired."  Loan, at 1; see also "Note" (part of LOC), at 1. The Debtor's monthly payments under the Loan are $30,265.16 and the LOC are $1,613.99.[1]

To preserve the going concern value of the Debtor, the Debtor hereby moves for (a) authority to use funds that constitute Cash Collateral (as defined in section 363 of the Bankruptcy Code) on an interim and final basis, and (b) approval of

---

[1]    The Debtor's UCC-1's research disclosed four State of California tax liens with the earliest lien recordation date of January 2025.  The total amount alleged in the four tax liens is approximately $97,917.79; however, the Debtor believes that it paid down a portion of the liens prior to the chapter 11 filing.

1  adequate protection for any creditor with a valid lien on Cash Collateral in the

2  form of a replacement lien.

3      As of the Petition Date, the Debtor holds a small amount of cash,

4  approximately $2,000.  The Debtor will be receiving cash during the first week of

5  its case from distributors and other vendors.  The cash collateral the Debtor seeks

6  authority to use is comprised of cash on hand and funds received postpetition (the

7  "Cash Collateral").  The Debtor believes that the expenses described in the Budget

8  represent those expenses that the Debtor must pay for the next five months to

9  maintain business operations.  Attached as Exhibit "C" to the Torres Declaration is

10  a budget of expected income and expenses for the immediate near future.

11     As adequate protection for the use of Cash Collateral, the Debtor proposes

12  granting any secured creditor a replacement lien on Cash Collateral to the same

13  validity, extent, and priority that such secured creditor possessed in prepetition

14  cash as of the Petition Date.

15  **II.   LEGAL DISCUSSION**

16     A.   The Nature of Cash Collateral

17     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157

18  and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter

19  is a core proceeding under 28 U.S.C. § 157(b)(2).

20     A debtor's use of property of the estate is governed by Bankruptcy Code

21  section 363(c)(1), which provides:

22

23

24

25

26

27

28

STRADLING YOCCA
CARLSON & RAUTH

-6-

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice and a hearing.

11 U.S.C. § 363(c)(1).  Bankruptcy Code section 1107(a) provides that a debtor in possession has the same rights as a trustee regarding property of the bankruptcy estate.

The term "cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest."  11 U.S.C. § 363(a).  A debtor in possession may use "cash collateral" under Bankruptcy Code section 363(c)(1) if either (A) the entity with an interest in cash collateral consents, or (B) the court, after notice and a hearing, authorizes such use.  11 U.S.C. § 363(c)(2)(A) – (B).  Bankruptcy Code section 363(e) provides that the Court may "prohibit or condition" the use of cash collateral "as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

Courts have consistently held that it is appropriate for a chapter 11 debtor to use a secured creditor's cash collateral for a reasonable period of time for the purpose of maintaining and operating its property.  *See MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397 (10th Cir. 1987); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981).  Courts have noted that access to cash collateral is critical:  "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business."  *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (quoting *In re Stein*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982)).

1   The primary source of revenue used by the Debtor is cash on hand and cash

2   collateral.  If the Debtor were unable to use cash and cash collateral, its

3   reorganization efforts would fail, which would lead to the worst possible result for

4   the Debtor, its creditors, employees, and other parties in interest.  The Budget

5   contains the necessary and operating expenses that the Debtor must pay in order to

6   preserve the Debtor's value as a going concern.

7       B.    Secured Creditors are Adequately Protected

8       The Court may authorize the debtor to use a secured creditor's cash

9   collateral if the Court determines that the secured creditor is adequately protected.

10  *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir. 1984); *McCombs*

11  *Properties VI, Ltd. v. First Texas Savings Association (In re McCombs Properties*

12  *VI, Ltd.)*, 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).  What constitutes adequate

13  protection is decided on a case by case basis.  *See In re Feather River Orchards*,

14  56 B.R. 972, 974 (Bankr. E.D. Cal. 1986), and courts have broad flexibility under

15  Bankruptcy Code section 361 in what determines adequate protection.  *See, e.g., In*

16  *re Green*, 436 B.R. 91, 94 (Bankr. S.D. Ill. 2010) ("[W]hether a particular secured

17  creditor is adequately protected is a determination to be made on a case-by-case

18  basis and is within the discretion of the court.").

19      In ordinary circumstances, a secured creditor is to be protected against a

20  decrease in value that directly affects the secured creditor's interest in its collateral.

21  *See United Savings Association of Texas v. Timbers of Inwood Forest Associates,*

22  *Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 630 (1988).  Further, Bankruptcy Code section

23  506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's claim)

24  to the lesser of the [allowed amount of the] claim or the value of the collateral."

25  *McCombs*, 88 B.R. at 266.

26      If a creditor is oversecured (value of collateral greater than amount of

27  claim), then *Timbers* dictates that "there is no lack of adequate protection [even if

28  there is] a decline in collateral value" so long as the secured creditor remains

oversecured. *McCombs*, 88 B.R. at 266.[2]  As detailed below, in this case, the Debtor asserts that secured creditors would be adequately protected by (i) replacement liens and (ii) the Debtor's continued maintenance and operation of its business.

### 1.    Replacement Liens

Section 361 of Bankruptcy Code explicitly provides that "adequate protection may be provided by . . . [a] replacement lien to the extent that such . . . use [of cash collateral] results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(2); *See Timbers*, 484 U.S. at 370.

As adequate protection, the Debtor offers valid, enforceable, non-avoidable and fully perfected replacement liens on, and security interests in, all assets of the Debtor's estate that secured the valid, enforceable, non-avoidable and fully perfected liens of Live Oak as of the Debtor's petition date and all post-petition proceeds obtained by the Debtor from such pre-petition collateral of Live Oak (the "Adequate Protection Liens"); with such Adequate Protection Liens to have the same validity, scope and priority as the pre-petition liens of Live Oak.

### 2.    Live Oak Will Also Be Protected By the Debtor's Continued Operations

As a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral. *See In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982).  In *Stein*, the bankruptcy court held that the creditor's secured position would enhanced by the Debtor's continued operations. *Id.; see*

---

[2]    The Debtor reserves the right to assert that Live Oak is over-secured at any continued hearing on cash collateral approval.  The Debtor believes that Live Oak is oversecured based on a 2022 appraisal and the Debtor's going-concern value.  However, the appraisal has been designated as confidential and cannot be reproduced or distributed without the prior written consent of the appraisal company that provided services to Live Oak.  When the Debtor contacts Live Oak about the filing of this chapter 11 case (where it will attempt to reach a cash collateral stipulation), it will attempt to obtain consent to disclosure of the appraisal (under seal if necessary).  The Debtor is also informed that Live Oak has a more updated appraisal; however, the Debtor is unaware of the contents of that appraisal.  Hence, in sum and if necessary, the Debtor reserves the ability to argue that Live Oak is oversecured at any future hearings.

*also McCombs*, 88 B.R. at 267.  The Debtor intends to use the Cash Collateral to operate and preserve the business as set forth in the exhibits to the Torres Declaration.  The use of cash collateral is essential to continue the ordinary maintenance and operation of the business.

In the present case, the Debtor believes that the only creditor with a valid lien on Cash Collateral is Live Oak.  The Debtor seeks entry of an order confirming that the Debtor can use cash on hand to make payroll and pay other ordinary course expenses during its case.  Use of the cash collateral is essential to the Debtor's business and successful chapter 11 case.  Absent use of the cash collateral, the Debtor would not be able to (i) satisfy ordinary operating costs, (ii) make payments to employees, and (iii) preserve assets of the estate.

Furthermore, from a policy point of view, courts have set forth the critical nature of cash collateral:

> In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11.  Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest.  Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end.  Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.

*In re O'Connor*, 808 F.2d 1393, 1937 (10th Cir. 1987).

Finally, to the extent that continued operations are not sufficient, the Debtor is offering adequate protection in the form of replacement liens on the Debtor's cash to the same extent, priority, and validity as existed on the Petition Date.

## C.   Waiver of Any Stay is Appropriate

The Debtor requests a waiver of the 14-day stay provided for under Bankruptcy Rule 6004 because the Debtor needs to use cash collateral as soon as possible to maintain its business as a going concern for the benefit of the Debtor's estate.  The Debtor thus requests that any applicable stay, including the stay provided for under Bankruptcy Rule 6004, be waived to allow the order approving this Motion to become immediately effective.

## III.   CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order:

(i)      granting the Motion on an interim basis, pending a final hearing;

(ii)     approving the form and scope of notice proposed by the Debtor;

(iii)    authorizing the Debtor to use cash collateral to pay all the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by not more than 15%, on a cumulative and line-item basis;

(iv)    waiving the stay of Bankruptcy Rule 6004;

(v)     setting a final hearing on the Motion; and

(vi)    granting such other and further relief that the Court deems just and proper under the circumstances.

DATED:  July 28, 2025          STRADLING YOCCA CARLSON & RAUTH
                               A PROFESSIONAL CORPORATION


                               By:   /s/ Gregory K. Jones
                                     *Gregory K. Jones*
                                     Proposed Counsel for Debtor and Debtor
                                     in Possession

# DECLARATION OF NICOLE TORRES

I, Nicole Torres, declare as follows:

I am the Accountant and Head of Human Resources for GRDN Hospitality, LLC, d/b/a Three Weavers Brewing Company ("the "Debtor"). I submit this Declaration in support of the Debtor's petition and the contemporaneously filed "Emergency Motion for Authority to Use Cash Collateral on an Interim and Final Basis" (the "Motion"). As CEO, I am generally familiar with the Debtor's business, financial condition, policies and procedures, day to day operations and books and records. Except as otherwise indicated, the facts set forth in this declaration (the "Declaration") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees and consultants working under my supervision, or my opinions based on experience, knowledge, and information concerning the Debtor's operations and financial condition. If called upon to testify, I would testify competently to the facts as set forth in the Declaration.

1. On July 24, 2025 (the "Petition Date"), the Debtor commenced this subchapter V case by filing a petition for relief under chapter 11 of the Bankruptcy Code.

2. The Debtor operates an award-winning craft brewery in Inglewood, California. The Debtor, which was founded in 2013, is the first craft brewery in Inglewood and proudly stresses the importance of promoting a positive community. The Debtor's tasing room is near SoFi Stadium, the Forum, and the Intuit Dome.

3. The Debtor has approximately 12-15 core and seasonal beers on tap at all times, including Kolsch-Style lagers, IPAs, ales, porters, seltzers, and non-alcoholic beers. The Debtor's tasting room is located at 1031 West Manchester Blvd., and customers can attend the tasting room on a first-come, first-serve basis. Customers enjoy multiple big-screen TV monitors and can order food from local

food trucks.  Further, patrons can purchase core and seasonal beers (4-pack or 6-pack formats) or kegs to go.

4.      The Debtor has suffered from a number of different factors, including a supply chain disruption (March – August 2023), inflation (2024), and a general decline in the entire craft beer industry with the shift in consumer preferences away from beer and alcohol (2021 – present).

5.      More recently, the Debtor's owners were personally impacted by the January 7, 2025 fires in the Palisades area, and the tap room was shut down due to poor air quality.  In March, the current Federal government's implementation of tariffs led the Debtor to forecast that wholesale prices to its distributors would increase by 12-15%.  Additionally, the increase in minimum wage and health benefits approved by the City of Los Angeles will cause wage inflation and employee retention issues.  Finally, the recent June 7, 2025 ICE raids significantly deterred the Debtor's customers from visiting the tap room, and those customers have not returned.

6.      The Debtor is considering a number of reorganization options, including the potential renegotiation of its existing lease or to keep the Three Weavers brand alive by contracting with other entities in the brewing industry.

7.      As of the Petition Date, the Debtor was a party under an "Loan Agreement" (the "Loan") with Live Oak Banking Company dated September 22, 2022.  The Loan was in the amount of $2,520,000 and an SBA 7(a) Loan.  A true and correct copy of the Loan is attached hereto as Exhibit "A".

8.      Additionally, the Debtor and Live Oak entered into an SBA Express Line of Credit in the amount of $200,000 (the "LOC").  A true and correct copy of the Note evidencing the LOC is attached hereto as Exhibit "B".

9.      The Loan and are LOC are secured by, among other things, "all of Borrower's . . . assets, howsoever arising, wherever located and whether now

1    owned or existing or hereafter existing or acquired." The Debtor's monthly

2    payments under the Loan are $30,265.16 and the LOC are $1,613.99.

3        10.    As of the Petition Date, the Debtor holds very little in cash on hand.

4    The Debtor anticipates obtaining approximately $45,000 in cash in the first week

5    of the chapter 11 case based on fulfillment of orders and distributor payments.

6        11.    The Debtor requires the use of cash collateral to maintain and operate

7    its business and preserve its going concern value by paying ordinary and necessary

8    expenses, as set forth in the budget attached as Exhibit "C" (the "Budget") through

9    the end of 2025. The payments of the expenses reflected in the Budget are

10   necessary to avoid immediate and irreparable harm, and they are in the best interest

11   of the estate.

12       12.    As adequate protection for the use of Cash Collateral, the Debtor also

13   proposes granting any secured creditor a replacement lien on cash collateral to the

14   same validity, extent, and priority that such secured creditor possessed in the

15   prepetition cash as of the Petition Date.

16       I declare and verify under penalty of perjury that the foregoing is true and

17   correct to the best of my knowledge, information, and belief.

18       Executed on this 28$^h$ day of July, 2025, at Inglewood, California.

19

20   _____
     Nicole Torres

21

22

23

24

25

26

27

28

# EXHIBIT A

LOAN AGREEMENT
DATED AS OF

September 22 , 2022

BY AND BETWEEN

LIVE OAK BANKING COMPANY, AS LENDER

AND

GRDN HOSPITALITY, LLC, AS BORROWER

{04056590;v1 }

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** is made as of _September 22_, 2022, by and among GRDN HOSPITALITY, LLC, whose address is 1031 W. Manchester Boulevard, Unit A-E, Inglewood, CA 90301-1563 (**"Borrower"**), and Live Oak Banking Company, whose address is 1741 Tiburon Drive, Wilmington, NC 28403 (together with its successors and assigns, **"Lender"**).

In consideration of the premises and of the mutual covenants contained in this Agreement and intending to be legally bound, the parties agree as follows:

### ARTICLE I. Definitions

**1.1** **Definitions.** As used in this Agreement, unless otherwise specified, the following terms shall have the following respective meanings:

"**Affiliate**" means any Person who now or hereafter has Control of, or is now or hereafter under common Control with, Borrower or any Subsidiary or over whom or over which Borrower or any Subsidiary now or hereafter has Control.

"**Agreement**" means this agreement, including any Schedule hereto, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Anti-Terrorism Laws**" means any laws relating to terrorism or money laundering, including, without limitation, Executive Order No. 13224, the USA Patriot Act, the laws comprising or implementing the Bank Secrecy Act, and the laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the forgoing laws may from time to time be amended, renewed, extended or replaced).

"**Authorization**" means the SBA Loan Authorization dated September 15, 2022, SBA Loan # PLP 43046191-09.

"**Business Day**" means a day of the year which is neither a Saturday or Sunday nor a legal holiday on which banks are required or authorized by law to close in the State of North Carolina.

"**Closing**" or "**Closing Date**" means the closing of the transactions provided for in this Agreement, or such other date upon which the parties may agree.

"**Collateral**" means all of Borrower's and/or Guarantor's assets, howsoever arising, wherever located and whether now owned or existing or hereafter existing or acquired, as more fully described in the Collateral Documents.

"**Collateral Documents**" means collectively, any security agreement, UCC-1 financing statement, Mortgage, deed of trust, and any and all other documents at any time executed and delivered in connection therewith or with this Agreement securing the Lenders interest in Collateral, and any and all amendments, restatements, renewals or replacements thereof.

"**Constituent Documents**" means the applicable formation documents (articles of incorporation, articles of organization, partnership agreement, trust agreement, as applicable) and governance documents (by-laws, operating agreement, partnership agreement, trust agreement, as applicable) of any Obligor, as applicable.

"**Control**" means (a) the power to vote at least 50% of (i) the outstanding shares of any class of stock of a corporation or (ii) of any equity, membership or ownership interest in any partnership, limited partnership,

limited liability company or other business entity or (b) the beneficial ownership of at least 20% of (i) the outstanding shares of any class of stock of a corporation or (ii) of any outstanding equity, membership or ownership interest in any partnership, limited partnership, limited liability company or other business entity.

"**Environment**" means any water including, but not limited to, surface water and ground water or water vapor; any land including land surface or subsurface; stream sediments; air; fish; wildlife; plants; and all other natural resources or environmental media.

"**Environmental Laws**" means all foreign, federal, state, county, provincial and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances, regulations, codes and rules relating to the protection of the Environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the policies, guidelines, procedures, interpretations, decisions, orders and directives of any governmental authority with respect thereto.

"**Environmental Permits**" means all licenses, permits, approvals, authorizations, consents or registrations required by any applicable Environmental Laws and all applicable judicial and administrative orders in connection with ownership, lease, purchase, transfer, closure, use and/or operation of Borrower's property, including, without limitation, as may be required for the storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances.

"**ERISA Affiliate**" means any Person who is under common control with a Borrower within the meaning of Section 414(b) of the Internal Revenue Code of 1986, as amended, including, but not limited to, a Subsidiary of a Borrower.

"**Executive Order No. 13224**" means Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, amended, renewed, extended or replaced.

"**Guarantor**" or "**Guarantors**" means, jointly and severally, each Person or entity who guarantees payment of any Loan governed by this Agreement.

"**Guaranty**" or "**Guaranties**" means any guaranty agreement given by Guarantor to Lender, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Hazardous Substances**" means without limitation, any flammable explosives, radon, radioactive materials, asbestos, asbestos containing materials, urea formaldehyde foam insulation, lead based paints, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, hazardous wastes, hazardous or toxic substances, pollutant, contaminant, regulated substance, residual waste or related materials as defined in or subject to any Environmental Law, including, without limitation, the following federal statutes and any comparable state or county Environmental Laws: the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6901, et seq.), The Clean Water Act, as amended (33 U.S.C. Sections 1251, et seq.), The Safe Drinking Water Act (42 U.S.C. Sections 300f, et seq.), The Clean Air Act (42 U.S.C. Sections 7401, et seq.), and/or regulations adopted pursuant to any such Environmental Law.

"**Indebtedness**" of a Person at a particular date means all liabilities and obligations of such Person, including without limitation, those which in accordance with sound accounting principles would be classified upon a balance sheet as liabilities and all other indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, contingent or liquidated, matured or unmatured and all premiums, if any, due at the required prepayment dates of such any indebtedness, and all indebtedness secured by a lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person. Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

{04056590;v1 }

"**Leased Property**" means that certain real property located at 1031 W. Manchester Boulevard, Unit A-E, Inglewood, CA 90301-1563, leased by Borrower from Manchester Business Park.

"**Lender Affiliate**" means any bank or non-bank subsidiary (other than Lender) of Lender.

"**Loan**" and collectively, "**Loans**" has the meaning set forth in Section 2.1 of this Agreement.

"**Loan Document**" and collectively, "**Loan Documents**" means the Collateral Documents, the Notes, the Guaranties, the Mortgage, and any other documents, instruments or agreements executed in connection with the Loan, as may be amended, modified or supplemented from time to time.

"**Loan Maturity Date**" means the date set forth in the applicable Note issued pursuant to this Agreement on which a Loan is scheduled to be paid in full, unless such date is otherwise accelerated in accordance with the terms of this Agreement.

"**Margin Stock**" has the meaning set forth in Regulation U of the Board of Governors of the Federal Reserve System, as amended from time to time.

"**Material Adverse Effect**" means a material adverse effect on: (a) the property, assets, financial condition, business or operations of an Borrower ; (b) the ability of Borrower to perform any of its payment or other obligations under this Agreement, any Note, any Collateral Document or other Loan Document to which it is a party; (c) the legality, validity or enforceability of the obligations of Borrower under this Agreement, any Note, any Collateral Document or other Loan Document to which it is a party; or (d) the ability of Lender to exercise its rights and remedies with respect to, or otherwise realize upon, any of the collateral or any of the security for the obligations of Borrower or Guarantor to Lender or any Lender Affiliate under this Agreement, any Note, any Collateral Document or other Loan Document.

"**Note**" or "**Notes**" has the meaning set forth in Section 2.2 of this Agreement.

"**Obligor**" means any Borrower, Guarantor or any other Person providing collateral support for Borrower's obligations hereunder.

"**Pension Plan**" means any pension plan as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974 as amended ("ERISA") with respect to which Borrower or any Subsidiary has incurred or may incur liability, including contingent liability, under Title IV of ERISA, to such plan or to the Pension Benefit Guaranty Corporation. For purposes of this definition and for purposes of Section 7.1(i), "Borrower" shall include any trade or business (whether or not incorporated) which, together with Borrower or a Subsidiary, is deemed to be a "single employer" within the meaning of Section 4001(b)(1) of ERISA.

"**Permitted Distribution**" means any distributions to Borrower's members (i) in an amount equal to the amount of tax liability required to be paid by such members as a result of Borrower's taxable income passing through and being taxable to such members, or (ii) pursuant to the terms of the Borrower's Operating Agreement, provided, such payment shall not result in a Material Adverse Effect.

"**Permitted Encumbrances**" means any liens on collateral listed on Schedule 5.2 attached hereto.

"**Permitted Indebtedness**" means any debt incurred by Borrower listed on Schedule 5.1 attached hereto.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, trust, unincorporated association, government or political subdivision or other entity, body, organization or group.

"**Reportable Event**" means any event with regard to a Pension Plan described in Section 4043(b) of ERISA, or in Regulations issued thereunder.

{04056590;v1 }

3

"**SBA**" means the United States Small Business Administration.

"**Schedule**" means any Schedule that may be attached to this Agreement and made a part hereof.

"**Subsidiary**" means any corporation of which at least 25% of the voting stock is owned by Borrower directly, or indirectly through one or more Subsidiaries.

"**UCC**" means the Uniform Commercial Code as in effect in the State of Delaware.

"**USA Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

**1.2**    **Accounting Terms.**  All accounting terms not otherwise defined herein shall have the meaning assigned to them in accordance with sound accounting principles.

**1.3**    **UCC Definitions.**  Unless otherwise defined in this Agreement, capitalized words shall have the meanings set forth in the Uniform Commercial Code as in effect in the State of Delaware.

## ARTICLE II.  The Financing

**2.1**    **Loans.**  Lender agrees, based on the terms and conditions and relying upon the representations and warranties set forth in this Agreement, to lend to Borrower, and Borrower agrees to borrow from Lender, one or more loans to be more fully described in the Notes and payable according to the terms of the respective Notes (each a "Loan" and collectively the "Loans"). As a condition to the making of any Loan, Borrower shall execute and deliver to Lender a Note or Notes evidencing the terms of repayment of such Loan.

**2.2**    **The Notes.**  The Loan subject to this Agreement shall be evidenced in part by, and payable as provided in, a note (other than any demand note) (as amended, restated or otherwise modified from time to time each a "Note" and collectively the "Notes") executed by Borrower.

**2.3**    **Interest and Late Charges.**

(a)    Interest and Late Charges on the Loan.  The Loan shall bear interest at a per annum rate equal to the interest rate set forth in the applicable Note evidencing such Loan until maturity (whether by acceleration or otherwise) and thereafter until paid in full on the unpaid principal amount thereof. If any payment of principal of or interest on any Note is not paid when due, Borrower shall pay to Lender any late charge set forth in the applicable Note.

(b)    Computation of Interest and Payment.  Accrued interest on the Loan shall be paid on the dates set forth in the Note, and on the date the Loan is paid in full. Interest on the Loan shall be calculated on the basis set forth in the Note. Principal payments shall be made as set forth in the Note.

**2.4**    **Use of Proceeds.**  Proceeds of the Loan shall be used for the purposes set forth in the Authorization.

**2.5**    **Conditions Precedent.**  Lender shall not be obligated to advance any Loan if (a) any Event of Default shall occur or be continuing or (b) Borrower fails to meet any other conditions set forth in the Loan Documents.

**2.6**    **Advances.**  Borrower acknowledges and agrees that the Loan may not be fully disbursed on the date hereof. For all disbursements of Loan funds made, or to be made, after the date hereof, to Borrower, or on Borrower's behalf, in either a lump sum or on a multiple advance basis under the terms and conditions of the Authorization and this Agreement (each an "**Advance**"), Borrower agrees as follows:

{04056590;v1 }

(a)      Application for Advances. Each application shall be stated on a standard Lender request for payment form or other form approved by Lender, executed by Borrower, and supported by such evidence as Lender shall reasonably require. Each application for an Advance shall be deemed a certification of Borrower that as of the date of such application, all representations and warranties contained in the Authorization, this Agreement and all of the other Loan Documents are true and correct, and that Borrower is in compliance with all of the provisions of the Loan Documents.

(b)      Payments. At the sole option of Lender, Advances may be paid in the name of Borrower and/or party as designated by Borrower. This power shall be deemed coupled with an interest, shall be irrevocable, and shall survive an Event of Default under the Loan Documents.

2.7      **Charge to Account**.  On the date that any principal of, or interest on, the Loan, or of any fees, expenses or charges payable are due, Borrower authorizes Lender to debit its deposit account #5798822531 maintained with California Bank and Trust on such due date in an amount equal to such unpaid principal, interest, fee, expense or charge, as applicable; provided that Lender shall be under no obligation to so debit any such deposit account.

## ARTICLE III.  Representations and Warranties

Borrower makes the following representations and warranties, which shall be deemed to be continuing representations and warranties so long as any indebtedness of Borrower to Lender or any Lender Affiliate, including indebtedness for fees and expenses, remains unpaid:

3.1      **Good Standing and Authority.**  If Borrower is not an individual, Borrower is an entity, duly organized, and validly existing, and in good standing under the laws of the state of its formation or organization; has all necessary power and authority to transact the business in which it is engaged; is duly licensed or qualified and in good standing in each other jurisdiction in which the conduct of such business requires such licensing or such qualification, except where the failure to be so licensed or qualified would not have a Material Adverse Effect. Borrower has all necessary power and authority to enter this Agreement and to execute, deliver and perform this Agreement and all other Loan Documents executed in connection with this Agreement, all of which have been duly authorized by all proper and necessary action by Borrower and the owners of Borrower.

3.2      **Valid and Binding Obligation.**  This Agreement and all other Loan Documents executed in connection herewith constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their respective terms except as enforceability may be limited by applicable bankruptcy and insolvency laws and laws affecting creditor's rights generally.

3.3      **Good Title.**  Borrower has good and marketable title to all of its assets, none of which is subject to any mortgage, indenture, pledge, lien, conditional sale contract, security interest, encumbrance, claim, trust or charge except for Permitted Encumbrances.

3.4      **No Pending Litigation.**  There are not any actions, suits, proceedings (whether or not on behalf of Borrower) or investigations pending or, to the best of Borrower's knowledge, threatened against Borrower which, if adversely determined, would, in any case or in the aggregate, have a Material Adverse Effect, or which question the validity of this Agreement and the other Loan Documents required by this Agreement, or any action taken or to be taken pursuant to any of the foregoing.

3.5      **No Consent or Filing.**  No consent, license, approval or authorization of, or registration, declaration or filing with, any court, governmental body or authority or other Person, which has not been obtained or made, is required in connection with the valid execution, delivery or performance of this Agreement and the other Loan Documents required by this Agreement or in connection with any of the transactions contemplated thereby, other than filings and recordings in connection with the Collateral Documents.

**3.6**    **No Violations.**  Borrower is not in violation of any term of its Constituent Documents, or of any mortgage, borrowing agreement or other instrument or agreement pertaining to indebtedness for borrowed money. Borrower is not in violation of any term of any other indenture, instrument, or agreement to which it is a party or by which it may be bound, resulting, or which might reasonably be expected to result, in a Material Adverse Effect. Borrower is not in violation of any order, writ, judgment, injunction or decree of any court of competent jurisdiction. To Borrower's best knowledge, Borrower is not in violation of any statute, rule or regulation of any competent governmental authority, the violation of which could have a Material Adverse Effect. The execution and delivery of the Loan Documents required by this Agreement and the performance of all of the same is and will be in compliance with the foregoing and will not result in any violation or result in the creation of any mortgage, lien, security interest, charge or encumbrance upon any properties or assets except in favor of Lender. There exists no fact or circumstance not disclosed in this Agreement or in the documents furnished in connection herewith (other than general economic conditions) which does, or in the future could, have a Material Adverse Effect.

**3.7**    **Financial Statements.**  Borrower has furnished to Lender financial statements, satisfactory to Lender in Lender's sole discretion, showing Borrower's financial condition as of the end of Borrower's most recently completed fiscal year which statements represent fairly the results of its operations and transactions as of the dates and for the period referred to and have been prepared in accordance with sound accounting principles. From the date of such financial statements to the date of the execution of this Agreement, there has not been any Material Adverse Effect or any fire, explosion, accident, flood, drought, storm, earthquake, condemnation, statutory or regulatory change, act of God, or act of public enemy or other casualty, whether or not insured, which would cause a Material Adverse Effect.

**3.8**    **Tax Returns.**  Borrower has duly filed all federal and other tax returns required to be filed and has paid all taxes required by such returns through its latest fiscal year end, and has not received any assessments by the Internal Revenue Service or other taxing authority for additional unpaid taxes.

**3.9**    **ERISA Matters.**  Except in compliance with all applicable laws and regulations, no Pension Plan has been terminated or partially terminated or is insolvent or in reorganization, nor have any proceedings been instituted to terminate or reorganize any Pension Plan; neither Borrower nor any Subsidiary has withdrawn from any Pension Plan, nor has a condition occurred which if continued would result in a complete or partial withdrawal; neither Borrower nor any Subsidiary has incurred any withdrawal liability to any Pension Plan; neither Borrower nor any Subsidiary has incurred any liability to the Pension Benefit Guaranty Corporation other than for required insurance premiums which have been paid when due; no Reportable Event has occurred; and no Pension Plan or other "employee pension benefit plan" as defined in Section 3 of ERISA to which Borrower or any Subsidiary is a party has an "accumulated funding deficiency." Each Pension Plan and each other "employee benefit plan" as defined in Section 3(2) of ERISA to which Borrower or any Subsidiary is a party is in substantial compliance with ERISA, and no such plan, or any administrator, trustee or fiduciary thereof has engaged in a prohibited transaction described in Section 406 of ERISA or in Section 4975 of the Internal Revenue Code.

**3.10**    **Solvency.**  Borrower is not insolvent as defined in any applicable state or federal statute, nor will Borrower be rendered insolvent by the execution and delivery of this Agreement and the other Loan Documents to Lender. After the making of each Loan hereunder, Borrower reasonably expects to (a) be able to pay its debts as they become due, (b) have funds and capital sufficient to carry on its business and all businesses in which it is about to engage, and (c) own property having a value at both fair valuation and at fair salable value in the ordinary course of Borrower's business greater than the amount required to pay its debts as they become due.

**3.11**    **Federal Reserve Regulations.**  Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the Loans will be used, directly or indirectly, for a purpose which violates any law, rule or regulation of any governmental body, including without limitation the provisions of Regulations U or X of the Board of Governors of the Federal Reserve System, as amended. No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

**3.12**    **Environmental Matters.**  To the knowledge of Borrower:  (a) No above ground or underground storage tanks containing Hazardous Substances are or have been located on any property owned, leased or operated

{04056590;v1 }

6

by Borrower and each Subsidiary; (b) No property owned, leased or operated by Borrower or any Subsidiary is or has been used for the unpermitted or unauthorized treatment, storage or disposal of Hazardous Substances; (c) No material Release of a Hazardous Substance has occurred or is threatened on, at, from or, near any property owned, leased or operated by Borrower or any Subsidiary that will now or in the future (based on Environmental Laws currently in effect) require (i) remedial or corrective action, removal, monitoring or closure pursuant to any Environmental Law currently in effect or (ii) Borrower or any Subsidiary to incur costs pursuant to the terms or conditions of any lease; (d) Neither Borrower nor, any Subsidiary is subject to any existing, pending or threatened suit, claim, notice of violation or request for information under any material Environmental Law; and (e) Borrower and each Subsidiary is in compliance in all material respects with, and have obtained all Environmental Permits required by all Environmental Laws.

    **3.13**    **Prohibited Person Compliance.**  Borrower warrants, represents and covenants that neither Borrower nor any Guarantor nor any of their respective Affiliates is or will be a Person (a) that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order 13224 issued on September 24, 2001 ("EO13224"), (b) whose name appears on the United States Treasury Department's Office of Foreign Assets Control ("OFAC") most current list of "Specifically Designated National and Blocked Persons," (c) who commits, threatens to commit or supports "terrorism," as defined in EO13224, or (d) who is otherwise affiliated with any entity or person listed above (any and all parties or persons described in subparts [a] - [d] above are herein referred to as a "Prohibited Person"). Borrower covenants and agrees that neither Borrower, nor any Guarantor nor any of their respective Affiliates will knowingly (i) conduct any business, nor engage in any transaction or dealing, with any Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services to or for the benefit of a Prohibited Person, or (ii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in EO13224. Borrower further covenants and agrees to deliver (from time to time) to Lender any such certification or other evidence as may be requested by Lender in its sole and absolute discretion, confirming each such representation.

<h3 style="text-align:center">ARTICLE IV.  <u>Affirmative Covenants</u></h3>

    Borrower covenants and agrees to:

    **4.1**    **Financial Reporting.**  Furnish to Lender or cause to be furnished to Lender the following financial information and such additional information, reports or statements as Lender may from time to time reasonably request regarding the financial and business affairs of Borrower and its Affiliates and any Guarantor:

    (a)    <u>Annual Financials</u>.  As soon as available, and in any event within 60 days after the end of Borrower's fiscal year for the year ending **December 31, 2022** and each fiscal year thereafter, a complete copy of Borrower's and Affiliates' annual financial statements on a consolidated basis and notes thereto for that year, prepared by Borrower and satisfactory to Lender in Lender's sole discretion.

    (b)    <u>Tax Returns</u>.  As soon as available, but no later than 30 days after filing for each fiscal year, or  in case of extension no later than the IRS extension period, beginning with the fiscal year ending **December 31, 2022** and for each year thereafter, signed copies of all federal tax returns of Borrower and Affiliates, including all related schedules and forms, and with evidence of extension, if applicable, for the requested fiscal year(s), all in reasonable detail and scope and certified to Lender's satisfaction.

    (c)    <u>Individual Guarantor Tax Returns</u>.  As soon as available, but no later than 30  days after filing for each calendar year, or  in case of extension no later than the IRS extension period,  beginning with the calendar year ending **December 31, 2022**, and for each year thereafter,  signed copies of all federal annual tax returns of each individual Guarantor including all related schedules and forms, and with evidence of extension, if applicable, for the requested calendar year(s), all in reasonable detail and scope and certified to Lender's satisfaction.

    (d)    <u>Personal Financial Statements</u>.  As soon as available, and in any event within 60 days after the end of each calendar year, beginning with the calendar year ending **December 31, 2022** and for each year

thereafter, each individual Guarantor's signed personal financial statement, in reasonable detail satisfactory to Lender, certified by such Guarantor as being true and correct.

        (e)    <u>Additional Documentation</u>. As soon as available, and in any event within thirty (30) days of receipt of written request, such other data, reports, statements and information (financial or otherwise), as Lender may reasonably request.

        **4.2**    **Taxes.** Promptly pay and discharge all of its taxes, assessments and other governmental charges prior to the date on which penalties are attached thereto, establish adequate reserves for the payment of taxes and assessments and make all required withholding and other tax deposits. Nothing herein shall be interpreted to require the payment of any tax, assessment or charge so long as its validity is being contested in good faith and by appropriate proceedings diligently conducted, and Borrower has established an adequate reserve for any such expense.

        **4.3**    **Insurance.** (a) Keep all its property so insurable insured at all times with responsible insurance carriers against fire, theft and other risks (including, if required, flood) in coverage, form and amount reasonably satisfactory to Lender and as is customary in the case of other Persons engaged in the same or similar business or having similar properties similarly situated; (b) keep adequately insured at all times in reasonable amounts with responsible insurance carriers against liability on account of damage to persons or property and under all applicable worker's compensation laws; (c) promptly deliver to Lender certificates of insurance in form and content acceptable to Lender for any of those insurance policies required to be carried by Borrower pursuant hereto which shall be in the name of Lender and it's successors and/or assigns, with appropriate endorsements designating Lender as additional insured and mortgagee or lender loss payee, or both, as requested by Lender; and (d) cause each such insurance policy to require the insurer to provide Lender with at least thirty (30) days' prior written notice of cancellation. If Borrower fails to comply with this Section 4.3, Lender is authorized to obtain such insurance in the name of Borrower or Lender at the expense of Borrower.

        **4.4**    **Litigation.** Promptly notify Lender in writing as soon as Borrower has knowledge thereof, and furnish or cause to be furnished to Lender such information regarding the same as Lender may request of (a) the institution or filing of any litigation, action, suit, claim or counterclaim to which Borrower is a party, or (b) any administrative proceeding against, or investigation of, Borrower by or before any regulatory body or governmental agency, where (i) the outcome of such litigation, action, suit, claim, counterclaim, administrative proceeding or investigation may have a Material Adverse Effect, or (ii) such litigation, action, suit, claim, counterclaim, administrative proceeding or investigation questions the validity of this Agreement or the other Loan Documents or any action taken or to be taken pursuant to the foregoing; and furnish or cause to be furnished to Lender such information regarding the same as Lender may request.

        **4.5**    **Entity Standing.** Maintain its existing entity status in good standing, and maintain its existing rights and franchises, in its jurisdiction of formation and remain or become duly licensed or qualified and in good standing in each jurisdiction in which the conduct of its business requires such qualification or licensing, except where the failure to be so licensed or qualified would not have a Material Adverse Effect.

        **4.6**    **Books and Records.** Maintain proper books and records in accordance with generally accepted accounting principles consistently applied, and notify Lender promptly in writing of any proposed change in the location at which such books and records are maintained.

        **4.7**    **Continue Business.** Engage only in the business conducted by it on the date of this Agreement and other businesses reasonably related thereto.

        **4.8**    **Notices.** Borrower will notify Lender in writing of the occurrence of any Event of Default or any act or condition, which, with the giving of notice or the passage of time might become an Event of Default.

**4.9**     **Environmental Compliance.**

(a)     Except as, in the aggregate, failure to comply could not reasonably be expected to have a Material Adverse Effect: (i) comply in all material respects with all Environmental Laws; and (ii) not suffer, cause or permit any material disposal of Hazardous Substances at any property owned, leased or operated by it or any Subsidiary except in accordance with applicable Environmental Laws.

(b)     Upon discovery by Borrower, promptly notify Lender in the event of the disposal of any Hazardous Substance in violation of any Environmental Law at any property owned, leased or operated by Borrower, or in the event of any material Release, or material threatened Release, of a Hazardous Substance in violation of any Environmental Law from any such property.

(c)     Deliver promptly to Lender (i) copies of any documents received from the United States Environmental Protection Agency or any state, county or municipal environmental or health agency concerning a violation or alleged violation by Borrower or any Subsidiary of any Environmental Law; and (ii) copies of any documents submitted by Borrower to the United States Environmental Protection Agency or any state, county or municipal environmental or health agency concerning the operations of Borrower or any Subsidiary.

**4.10**     **Other Acts.**  Execute and deliver, or cause to be executed and delivered, to Lender all further documents and perform all other acts and things which Lender deems necessary or appropriate to protect or perfect any security interests in any property directly or indirectly securing payment of any indebtedness of Borrower to Lender.

**4.11**     **Authorization.**  This Agreement is subject to the terms and conditions set forth in the Authorization, and shall comply with the terms and conditions in the Authorization.  Borrower shall deliver such information as required by the SBA, and assist Lender, as necessary to maintain compliance with the SBA regulations in order to preserve and protect the guaranty by the SBA to Lender securing the Loan.  This Agreement supplements the Authorization, to the extent there is a direct conflict in terms between this Agreement and the Authorization, the Authorization shall govern to the extent necessary to comply with SBA regulations.

**4.12**     **Deposit Account.**  Borrower must open and maintain its deposit accounts with Lender for the life of the loan.

### ARTICLE V.  Negative Covenants

Borrower, without the prior written consent of Lender, covenants and agrees that it will not:

**5.1**     **Borrowed Money.**  Except for Permitted Indebtedness listed on Schedule 5.1, if any, create, incur, assume or suffer to exist any liability for borrowed money except to Lender.

**5.2**     **Encumbrances.**  Except for Permitted Encumbrances listed on Schedule 5.2, if any, create, incur, assume or suffer to exist any mortgage, lien, security interest, pledge or other encumbrance on any of its property or assets, whether now owned or hereafter owned or acquired.

**5.3**     **Guaranties.**  Become a guarantor, surety or otherwise liable for the debts or other obligations of any other Person, whether by agreement to purchase the indebtedness of any other Person, or agreement for the furnishing of funds to any other Person through the purchase of goods, supplies or services (or by way of stock purchase, capital contribution, advance or loan) for the purpose of paying or discharging the indebtedness of any other Person, or otherwise, except as an endorser of instruments for the payment of money deposited to its bank account for collection in the ordinary course of business.

**5.4**     **Sale of Assets or Merger.**  Convey, sell, transfer, lease, or sell and lease back, all or any substantial portion of its property, assets or business to any other Person, or merge or consolidate with or into any other Person or into any joint venture or partnership with any other Person.

{04056590;v1 }

**5.5**     **Ownership Interests.**  Purchase, redeem, acquire or retire any of Borrower's ownership interests whether such interests are in the form of stock, partnership or limited partnership interests, limited liability company units or other ownership interests.

**5.6**     **Investments and Loans**.  Make or suffer to exist any investments in, or loans or advances to, any other Person except (a) advance payments or deposits against purchases made in the ordinary course of Borrower's regular business; (b) direct obligations to the United States of America; (c) any existing investments in, or existing advances to, any Affiliate; or (d) temporary advances to employees to cover expenses incurred in the ordinary course of Borrower's business.

**5.7**     **Dividends or Distributions.**  Pay or declare any cash dividends or distributions, except for Permitted Distributions.  For the purpose of clarity, salaries and/or bonuses given by the Borrower to members employed by the Borrower for such members' work performed on behalf of the Borrower's business, shall not be deemed to be a dividend or distribution.

### ARTICLE VI.  Conditions Precedent

**6.1**     **Conditions Precedent.**  Prior to or on the Closing Date, Borrower shall have furnished, or shall have caused to be furnished to Lender, at Borrower's own cost and expense, each of the following, as applicable, each in form and substance satisfactory to Lender in its sole discretion:

(a)     Loan Documents.  The Loan Documents shall have been executed and delivered to Lender and shall be in effect and all filings contemplated thereby shall have been made.  Borrower shall also deliver such other instruments, documents and certificates as Lender or its counsel shall reasonably require.

(b)     Constituent Documents.  Such Constituent Documents, resolutions, incumbency and any other documents required by Lender.

(c)     Insurance.  Evidence that the Borrower and each entity Guarantor have adequate insurance to insure its business operations and assets, including the Leased Property, as applicable, including without limitation, hazard, personal property, general liability, and other insurance necessary to its business operations, and that Lender has been named as mortgagee, additional insured and lender's loss payee, as its interests may appear, as applicable, entitled to thirty (30) days' prior notice of cancellation or modification, on all such policies of insurance covering the Leased Property.

(d)     Leases.  Copies of all leases with respect to any Leased Property.

(e)     Landlord Waiver.  Borrower shall use its best efforts to obtain an executed Landlord Waiver, prior to closing or post-closing, as determined satisfactory to Lender

(f)     Searches.  Copies of UCC and tax, lien and judgment searches on Seller, Borrower, Guarantors or other parties as required by Lender.

(g)     Invoices.  If the Loan is financing the purchase of Goods, Equipment or Inventory, copies of all invoices, purchases orders or contracts for equipment and/or inventory or other services to be paid with Loan proceeds.

(h)     Payoff Letter.  If the Loan is refinancing debt, payoff letter(s) effective through the funding date from each of the creditors being paid off with Loan proceeds, including the payoff amount, payoff instructions and agreement to release all liens against all Collateral, and evidence of such release of creditors' lien against Collateral at or after closing.

## ARTICLE VII.  Default

**7.1**    **Events of Default.**  The occurrence of any one or more of the following events shall constitute an event of default (individually, "Event of Default", or, collectively, "Events of Default"):

(a)    Nonpayment.  Nonpayment when due (pursuant to the terms of any Note or this Agreement) whether by acceleration or otherwise of principal of, interest on, or any fee or premium provided for hereunder or in any Note.

(b)    Covenants.  Default in the observance of any of the covenants or agreements of Borrower contained in this Agreement.

(c)    Voluntary Insolvency Proceedings.  If Borrower or any general partner of a Borrower shall (i) file a petition or request for liquidation, reorganization, arrangement, adjudication as a bankrupt, or other similar relief under the bankruptcy, insolvency or similar laws of the United States of America or any state or territory thereof or any foreign jurisdiction, now or hereafter in effect; (ii) consent to the filing of a petition in any bankruptcy, liquidation, reorganization or insolvency proceeding; (iii) make a general assignment for the benefit of creditors; (iv) consent to the appointment of a receiver or trustee for Borrower or any of Borrower's assets, including, without limitation, the appointment of or taking possession by a "custodian" as defined in the federal Bankruptcy Code; (v) make any, or send notice of any intended, bulk sale; or (vi) execute a consent to any other type of insolvency proceeding (under the federal Bankruptcy Code or otherwise) or any formal or informal proceeding for the dissolution or liquidation of, or settlement of claims against or winding up of affairs of, Borrower.

(d)    Involuntary Insolvency Proceedings.  The appointment of a receiver, trustee, custodian or officer performing similar functions for Borrower or any of Borrower's assets, including, without limitation, the appointment of or taking possession by a "custodian" as defined in the federal Bankruptcy Code; or the filing against Borrower of a request or petition for liquidation, reorganization, arrangement, adjudication as a bankrupt or other relief under the bankruptcy, insolvency or similar laws of the United States of America or any state or territory thereof or any foreign jurisdiction, now or hereafter in effect; or the institution against Borrower of any other type of insolvency proceeding (under the federal Bankruptcy Code or otherwise) or of any formal or informal proceeding for the dissolution or liquidation of, settlement of claims against or winding up of affairs of Borrower, and the failure to have such appointment vacated or such petition or proceeding dismissed within sixty (60) days after such appointment, filing or institution.

(e)    Representations.  If any certificate, statement, representation, warranty or financial statement furnished by or on behalf of Borrower pursuant to or in connection with this Agreement or any Note (including, without limitation, representations and warranties contained herein) or as an inducement to Lender or any Lender Affiliate to enter into this Agreement or any Note or any other lending agreement with Borrower shall prove to have been false in any material respect at the time as of which the facts therein set forth were certified, or to have omitted any material contingent or unliquidated liability or claim against Borrower, or if on the date of the execution of this Agreement there shall have been any materially adverse change in any of the facts disclosed by any such statement or certificate, which change shall not have been disclosed by Borrower to Lender at or prior to the time of such execution.

(f)    Other Indebtedness and Agreements.  Nonpayment by Borrower of any indebtedness, which is due and owing by Borrower (or, if permitted by the terms of the applicable document, within any applicable grace period), whether such indebtedness shall become due by scheduled maturity, by required prepayment, by acceleration, by demand or otherwise, or failure to perform any material term, covenant or agreement on its part to be performed under any agreement or instrument (other than this Agreement) evidencing or securing or relating to any indebtedness owing by Borrower when required to be performed if the effect of such failure is to permit the holder to accelerate the maturity of such indebtedness.

(g)    Judgments.  If any judgment or judgments, other than any judgment for which it is fully insured against Borrower, remains unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of twenty (20) days.

{04056590;v1 }

(h)     Pension Default.   Any Reportable Event which Lender or any Lender Affiliate determines constitutes grounds for the termination of any Pension Plan by the Pension Benefit Guaranty Corporation ("PBGC") or for the appointment by an appropriate United States district court of a trustee to administer any Pension Plan shall have occurred and continued 30 days after written notice thereof to Borrower by Lender or any Lender Affiliate; or the PBGC shall have instituted proceedings to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan; or a trustee shall be appointed by an appropriate United States district court to administer any Pension Plan; or any Pension Plan shall be terminated; or Borrower withdraws from a Pension Plan in a complete withdrawal or a partial withdrawal; or Borrower shall fail to pay to any Pension Plan any contribution which it is obligated to pay under the terms of such plan or any agreement, or which is required to meet statutory minimum funding standards of Section 412 of the Internal Revenue Code or Section 303 of ERISA.

(i)     Guarantor Default.   Any Guaranty shall cease, for any reason, to be in effect without the prior consent of Lender, or any Guarantor or Borrower shall so assert in writing; or any Guarantor shall die or become incapacitated or incarcerated and, if requested by Lender, in its sole discretion, Borrower shall have failed to agree to a replacement guaranty, cash collateral or other arrangement satisfactory to Lender as an adequate substitution for the Guaranty of such Guarantor; or any Guarantor shall fail to perform or observe any covenant contained in the Guaranty to which such Guarantor is a party; or any representation, warranty or financial statement made or furnished by a Guarantor in connection with this Agreement or the applicable Guaranty shall prove to have been false in any material respect, or to have omitted any material contingent or unliquidated liability; or there shall occur with respect to any Guarantor any event described in Section 7.1(d) or (e) hereof.

(j)     Challenge to Collateral Documents.   If any Obligor, directly or indirectly, shall challenge, or indicate their intention to challenge, the validity and binding effect of any provision of any of the Notes or the Collateral Documents or any of the Notes or the Collateral Documents shall for any reason (except to the extent permitted by their express terms) cease to be effective or cease to have the priority lien position required by the terms thereof or by this Agreement or the collateral is no longer available, for any reason.

(k)     Change of Ownership.   Any adjustment to or change in the ownership of a Borrower, including a change in percentage of ownership, without Lender's prior written approval.  SBA must approve any proposed adjustment to, or change in, ownership structure or interests in the Borrower, including percentage of ownership, within the first twelve (12) months after final disbursement of the Loan.

(l)     Termination of Business.   Any Obligor terminates its business or ceases to operate as a going concern.  If an individual, the death, incarceration or judicial declaration of incompetency of Borrower.

(m)     Material Adverse Change.   There shall occur any event or condition in an Obligor's business, operations or financial condition that has, or in Lender's judgment, is likely to have, a Material Adverse Effect.

**7.2     Effects of an Event of Default.**

(a)     Upon the happening of one or more Events of Default (except a default under either Section 7.1(d) or 7.1(e) hereof), Lender may declare any obligations it or any Lender Affiliate may have hereunder to be canceled and the principal of the Loans then outstanding to be immediately due and payable, together with all interest thereon and fees and expenses accruing under this Agreement without presentation, demand or further notice of any kind to Borrower and, if applicable, Borrower shall no longer be permitted to obtain advances of any Loans.

(b)     Upon the happening of one or more Events of Default under Section 7.1(d) or 7.1(e) hereof, Lender's and Lender Affiliates' obligations hereunder shall be cancelled immediately, automatically and without notice, and Loans then outstanding shall become immediately due and payable without presentation, demand or notice of any kind to Borrower.

(c)     Borrower hereby waives as a defense to the nonperformance of any obligations under the Loan Documents, the occurrence of unforeseen market conditions such as the disfunctionality or seizure of the credit markets.

{04056590;v1 }

**7.3** **Remedies.** Upon the occurrence and during the continuance of any Event of Default or upon any termination of this Agreement as a result of an Event of Default, then Lender and each Lender Affiliate shall have all of its rights under this Agreement or otherwise under law. In addition to, and without limitation of, any rights of Lender and each Lender Affiliate under applicable law, if any Event of Default occurs, any and all deposits (including all account balances, whether provisional or final and whether or not collected or available) and any other indebtedness at any time held or owing by Lender and each Lender Affiliate to or for the credit or account of Borrower may be offset and applied toward the payment of the indebtedness of Borrower to Lender and each Lender Affiliate. Lender may, in its sole discretion, exercise alternately or cumulatively any of the remedies available hereunder or under any other document securing the indebtedness, or at law or equity. The failure to exercise one or more of such remedies upon the happening of an Event of Default shall not constitute a waiver of the right to exercise the same at any subsequent time in respect of the same Event of Default or any other Event of Default. Neither the acceptance by Lender of any payment hereunder which is less than payment in full of all amounts due and payable at the time of such payment, or any negotiation or discussion with Borrower, shall constitute a waiver of the right to exercise one or more of such remedies at that time or at any subsequent time or nullify any prior exercise of any remedy, except as and to the extent otherwise provided by law.

## ARTICLE VIII. Expenses and Indemnification

**8.1** **Reimbursement.** Borrower shall reimburse Lender promptly upon request by Lender for all of its and each Lender Affiliate's out-of-pocket expenses including, without limitation, reasonable counsel fees and expenses, filing fees and recording fees incurred in connection with this Agreement and with any indebtedness subject hereto, for any taxes which Lender or any Lender Affiliate may be required to pay in connection with the execution and delivery of the Loan Documents, and for any expenses, including reasonable counsel fees and expenses, incident to the enforcement of any provision of the Loan Documents.

**8.2** **Indemnity.** Borrower agrees to indemnify Lender and hereby holds Lender harmless against all claims, actions, suits, proceedings, costs, expenses, brokerage or other fees, losses, damages and liabilities of any kind including in tort, penalties and interest, which Lender may incur in any manner other than Lender's own gross negligence or willful misconduct, by reason of any matter relating, directly or indirectly, to the Loans and the Loan Documents.

**8.3** **Indemnification of Lender.** Borrower agrees to indemnify, to defend and to save and hold Lender harmless from any and all claims, suits, obligations, damages, losses, costs and expenses (including, without limitation, Lender's attorney's fees), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by Lender, its officers, directors, employees, and agents arising out of, relating to, or in any manner occasioned by this Agreement and the exercise of the rights and remedies granted Lender under this, as well as by: (1) the ownership, use, operation, construction, renovation, demolition, preservation, management, repair, condition, or maintenance of any part of the Collateral; (2) the exercise of any of Borrower's rights collaterally assigned and pledged to Lender hereunder; (3) any failure of Borrower to perform any of its obligations hereunder; and/or (4) any failure of Borrower to comply with the environmental and ERISA obligations, representations and warranties set forth herein. The foregoing indemnity provisions shall survive the cancellation of this Agreement as to all matters arising or accruing prior to such cancellation and the foregoing indemnity shall survive in the event Lender elects to exercise any of the remedies as provided under this Agreement following the default hereunder. Borrower's indemnity obligations under this section shall not in any way be affected by the presence or absence of covering insurance, or by the amount of such insurance or by the failure or refusal of any insurance carrier to perform any obligation on its part under any insurance policy or policies affecting the Collateral and/or Borrower's business activities. Should any claim, action or proceeding be made or brought against Lender by reason of any event as to which Borrower's indemnification obligations apply, then, upon Lender's demand, Borrower, at its sole cost and expense, shall defend such claim, action or proceeding in Borrower's name, if necessary, by the attorneys for Borrower's insurance carrier (if such claim, action or proceeding is covered by insurance), or otherwise by such attorneys as Lender shall approve. Lender may also engage its own attorney at its reasonable discretion to defend Borrower and to assist in its defense and Borrower agrees to pay the fees and disbursements of such attorneys.

## ARTICLE IX. Other

**9.1     Amendments and Waivers.**  No modification, rescission, waiver, release or amendment of any provision of this Agreement shall be made except by another written agreement subscribed by duly authorized officers of Borrower and Lender.

**9.2     Delays and Omissions.**  No course of dealing and no delay or omission by Lender in exercising any right or remedy hereunder or with respect to any indebtedness of Borrower to Lender shall operate as a waiver thereof or of any other right or remedy, and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy.  Lender may remedy any default by Borrower hereunder or with respect to any other person, firm or corporation in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Borrower and shall be reimbursed for its expenses in so remedying such default.  All rights and remedies of Lender hereunder are cumulative.

**9.3     Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of Lender, Borrower and their respective successors and assigns, except that Borrower may not assign or transfer any of its rights hereunder without the prior written consent of Lender.

**9.4     Notices.  Any notice or demand to be given hereunder shall be effective if delivered or mailed to Borrower at the address set forth in the opening paragraph of this Agreement and to Lender at 1741 Tiburon Drive, Wilmington, North Carolina 28403, via overnight delivery service or personal service or, if mailed, three days after deposit, postage prepaid, in an official depository maintained by the United States Post Office for the collection of mail.**

**9.5     Entire Understanding.**  This Agreement and the other Loan Documents represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersede all prior negotiations and writings between the parties, including specifically, but without limitation, the application for the Loan, any commitment letter and correspondence related thereto.

**9.6     Force Majeure.**  Borrower agrees that Lender shall not be liable and Borrower will indemnify and hold Lender harmless from and against any error, failure or delay in the performance of any of Lender's obligations under this Agreement which cause is beyond the control of Lender, including, without limitation, any natural disaster, fire, flood, storm, war, strike, civil unrest, terrorism, error in inoperability of communication equipment or links or power supply, compliance with law or governmental order, direction of a jurisdiction or any other circumstances beyond the control of Lender or actions taken by Lender which were reasonably believed by Lender to be taken pursuant to this Agreement.

**9.7     Inconsistent Provisions.**  The terms of this Agreement and any related agreements, instruments or other documents, including, without limitation, the Notes and the Collateral Documents, and the other Loan Documents shall be cumulative except to the extent that they are specifically inconsistent with each other, in which case the terms of this Agreement shall prevail.

**9.8     USA Patriot Act.**  Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56), Lender is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the USA Patriot Act.

**9.9     Limitation of Liability.**  To the fullest extent permitted by applicable law, Borrower shall not assert, and hereby waives any claim against Lender, on any theory of liability, for special, indirect, consequential or punitive damages (but excluding direct or actual damages) arising out of, in connection with or as a result of, this Agreement, any related Loan Documents, the transactions contemplated hereby or thereby or any Loan or the use of the proceeds.

**9.10     Credit Reporting.**  Lender is required by the Debt Collection Improvement Act of 1996 and by the SBA to comply with the provisions of 31 U.S.C. §3711 and report information relating to the extension of the

{04056590;v1 }

Loan to consumer or commercial reporting agencies or bureaus, as appropriate (the "Reporting Agencies"). The Borrower and Guarantor acknowledge this requirement and further, by execution of this Loan Agreement, agree that the Lender may in the future report further information concerning the Loan, including delinquent payments, other Loan defaults, or charge offs to Reporting Agencies. This information may be reflected in reports issued by Reporting Agencies. Further, Borrower and Guarantor acknowledge and agree that if the small business defaults on the SBA-guaranteed loan and SBA suffers a loss, Lender is required to report any Loan charge offs to the Department of Treasury's delinquent debtor databases, including without limitation, to the Credit Alert Interactive Voice Response System ("CAIVRS") and Debt Check, which may affect their eligibility for further financial assistance.

**9.11  CONFLICT OF LAW PROVISIONS. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NORTH CAROLINA; EXCEPT AND ONLY TO THE EXTENT OF PROCEDURAL MATTERS RELATED TO THE PERFECTION AND ENFORCEMENT OF LENDER'S RIGHTS AND REMEDIES AGAINST THE COLLATERAL, WHICH MATTERS SHALL BE GOVERNED BY THE LAWS OF THE STATE IN WHICH SUCH COLLATERAL IS LOCATED. THIS CHOICE OF STATE LAWS IS EXCLUSIVE TO THE LENDER. BORROWER SHALL NOT HAVE ANY OPTION TO CHOOSE THE LAWS BY WHICH THIS AGREEMENT SHALL BE GOVERNED. BORROWER ACKNOWLEDGES THAT THIS AGREEMENT IS BEING SIGNED BY THE LENDER IN PARTIAL CONSIDERATION OF LENDER'S RIGHT TO ENFORCE IN THE JURISDICTION STATED ABOVE. HOWEVER, IN THE EVENT THAT THE ENFORCEABILITY OR VALIDITY OF ANY PROVISION OF THIS AGREEMENT, THE NOTE OR THE LOAN DOCUMENTS IS CHALLENGED OR QUESTIONED, SUCH PROVISION SHALL BE GOVERNED BY WHICHEVER APPLICABLE STATE OR FEDERAL LAW WOULD UPHOLD OR ENFORCE SUCH CHALLENGED OR QUESTIONED PROVISION.**

**9.12  JURISDICTION; WAIVER. BORROWER AGREES THAT LENDER AND/OR ITS SUCCESSORS AND ASSIGNS SHALL HAVE THE OPTION BY WHICH STATE LAWS THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED: (A) THE LAWS OF THE STATE OF NORTH CAROLINA;  OR (B) IF COLLATERAL HAS BEEN PLEDGED TO SECURE THE LIABILITIES, THEN BY THE LAWS OF THE STATE OR STATES WHERE THE COLLATERAL IS LOCATED, AT LENDER'S OPTION. THIS CHOICE OF STATE LAWS IS EXCLUSIVE TO THE LENDER. BORROWER SHALL NOT HAVE ANY OPTION TO CHOOSE THE LAWS BY WHICH THIS AGREEMENT SHALL BE GOVERNED. BORROWER ACKNOWLEDGES THAT THIS AGREEMENT IS BEING SIGNED BY THE LENDER IN PARTIAL CONSIDERATION OF LENDER'S RIGHT TO ENFORCE IN THE JURISDICTION STATED ABOVE. BORROWER CONSENTS TO JURISDICTION IN THE STATE OF NORTH CAROLINA OR THE STATE IN WHICH ANY COLLATERAL IS LOCATED AND VENUE IN ANY FEDERAL OR STATE COURT IN THE STATE OF NORTH CAROLINA OR THE STATE IN WHICH COLLATERAL IS LOCATED FOR SUCH PURPOSES AND WAIVES ANY AND ALL RIGHTS TO CONTEST SAID JURISDICTION AND VENUE AND ANY OBJECTION THAT SAID COUNTY IS NOT CONVENIENT. BORROWER WAIVES ANY RIGHTS TO COMMENCE ANY ACTION AGAINST LENDER IN ANY JURISDICTION EXCEPT STATE OF NORTH CAROLINA, OR IF LENDER CHOOSES TO LITIGATE IN A STATE WHERE COLLATERAL IS LOCATED THEN IN SUCH COUNTY AND STATE. LENDER AND BORROWER HEREBY EACH EXPRESSLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY WITH RESPECT TO ANY MATTER WHATSOEVER RELATING TO, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE LOAN, THE DOCUMENTS AND/OR THE TRANSACTIONS WHICH ARE THE SUBJECT OF THE DOCUMENTS.**

**9.13  NOTICE TO BUSINESS CLIENTS. LENDER MAY OBTAIN AND VERIFY INFORMATION FROM THIRD-PARTY PROVIDERS OF BUSINESS CREDIT RATINGS AND OTHER THIRD PARTIES, ABOUT YOUR BUSINESS, AS DETERMINED BY LENDER, IN CONSIDERING ANY CREDIT INQUIRY OR APPLICATION FOR CREDIT AND SUBSEQUENTLY ANY FUTURE LEGITIMATE PURPOSES IN CONNECTION WITH EXISTING OR POTENTIAL EXTENSIONS OF CREDIT TO YOUR BUSINESS. SUCH PURPOSES MAY INCLUDE, WITHOUT LIMITATION, REVIEWING, AUDITING, RENEWING, MODIFYING, OR COLLECTING ANY SUCH EXTENSION OF**

CREDIT. LENDER MAY FURNISH OR EXCHANGE INFORMATION ABOUT YOUR BUSINESS, AS APPLICABLE, AND, IF APPLICABLE, ANY EXTENSIONS OF CREDIT TO YOUR BUSINESS, WITH OTHERS. THIS INFORMATION MAY INCLUDE INFORMATION FURNISHED IN CONNECTION WITH A CREDIT INQUIRY, APPLICATION, PAYMENT HISTORY OR OTHER INFORMATION ABOUT AN EXTENSION OF CREDIT.

9.14    ELECTRONIC SIGNATURES.    OBLIGORS EXPLICITLY CONSENT TO THE ELECTRONIC DELIVERY AND ACCEPTANCE OF THE TERMS OF THE TRANSACTION EVIDENCED BY THIS AGREEMENT AND AGREE THAT THEY PRESENTLY INTEND TO BE BOUND BY THIS AGREEMENT. THIS AGREEMENT AND ALL DOCUMENTS EXECUTED IN CONNECTION THEREWITH MAY BE EVIDENCED BY ELECTRONICALLY SIGNED SIGNATURE PAGES VIA DIGITAL TRANSMISSION AND ARE DEEMED TO BE VALID EXECUTION AND DELIVERY AS THOUGH AN ORIGINAL INK SIGNATURE. DELIVERY OF A COPY OF THIS AGREEMENT BEARING AN ORIGINAL OR ELECTRONIC SIGNATURE BY ELECTRONIC MAIL IN "PORTABLE DOCUMENT FORMAT" (.PDF) FORM, OR BY ANY OTHER ELECTRONIC MEANS WILL HAVE THE SAME EFFECT AS PHYSICAL DELIVERY OF THE PAPER DOCUMENT BEARING AN ORIGINAL OR ELECTRONIC SIGNATURE.

[SIGNATURE PAGE IMMEDIATELY FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have caused this Loan Agreement to be signed by their duly authorized officers as of the date first written above.

BORROWER:

GRDN HOSPITALITY, LLC

By: _____
Lynne Miwa Weaver, Manager

LENDER:

Live Oak Banking Company

By: _____
Name: _____
Title: _____

Agreed to and Acknowledged by:

GUARANTORS:

_____
Lynne Miwa Weaver, Individually

_____
Jonathan Douglas Weaver, Individually

{04056590;v1 }

[SIGNATURE PAGE TO LOAN AGREEMENT]

## SCHEDULES

### Permitted Indebtedness. – Schedule 5.1

(a) Indebtedness owed to the Lender; (b) Indebtedness secured by Permitted Encumbrances listed in Schedule 5.2; and (c) trade payables in the ordinary course of business

### Permitted Encumbrances. – Schedule 5.2

(a) liens for taxes, assessments, or similar charges incurred in the ordinary course of business that are not yet due and payable; (b) other liens in favor of the Lender; and (c) any existing liens permitted pursuant to the SBA Authorization.

[SCHEDULES TO LOAN AGREEMENT]



# U.S. Small Business Administration

# NOTE

| SBA Loan # | PLP 43046191-09 |
|---|---|
| SBA Loan Name | Three Weavers Brewing Company |
| Date | |
| Loan Amount | $2,520,000.00 |
| Interest Rate | Wall Street Journal Prime Rate plus 1.50% |
| Borrower | GRDN HOSPITALITY, LLC |
| Operating Company | N/A |
| Lender | Live Oak Banking Company |

1.   PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of Two Million Five Hundred Twenty Thousand Dollars, interest on the unpaid principal balance, and all other amounts required by this Note.

2.   DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

3.    PAYMENT TERMS:

Maturity: This Note will mature in 12 years from date of Note.

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate on this Note will fluctuate. The initial interest rate is 7.00% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 1.50%. The initial interest rate must remain in effect until the first change period begins unless changed in accordance with SOP 50 10.

Borrower must pay one payment of interest only on the disbursed principal balance two months from the month this Note is dated; payment must be made on the fifth calendar day in the month it is due.

Borrower must pay principal and interest payments of $26,031.05 every month, beginning three months from the month this Note is dated; payments must be made on the fifth calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted every calendar quarter (the "change period"), beginning October 1, 2022 (date of first rate adjustment).

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or the first day of the month in which any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 1.50% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

The interest rate adjustment period may only be changed in accordance with SOP 50 10.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

**Borrower may Prepay this Note.** Borrower may prepay 20% or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20% and the Loan has been sold on the secondary market, Borrower must:

a.      Give Lender written notice;
b.      Pay all accrued interest; and
c.      If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 12 years from date of Note.

**Late Charge:** If a payment on this Note is more than 15 days late, Lender may charge Borrower a late fee of up to 4.00% of the unpaid portion of the regularly scheduled payment.

4.   DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A.   Fails to do anything required by this Note and other Loan Documents;

B.   Defaults on any other loan with Lender;

C.   Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D.   Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E.   Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F.   Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G.   Fails to pay any taxes when due;

H.   Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I.   Has a receiver or liquidator appointed for any part of their business or property;

J.   Makes an assignment for the benefit of creditors;

K.   Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L.   Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M.   Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5.   LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.   Require immediate payment of all amounts owing under this Note;

B.   Collect all amounts owing from any Borrower or Guarantor;

C.   File suit and obtain judgment;

D.   Take possession of any Collateral; or

E.   Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6.   LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.   Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B.   Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C.   Release anyone obligated to pay this Note;

D.     Compromise, release, renew, extend or substitute any of the Collateral; and

E.     Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7.     **WHEN FEDERAL LAW APPLIES:**

When SBA is the holder this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8.     **SUCCESSORS AND ASSIGNS:**

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9.     **GENERAL PROVISIONS:**

A.     All individuals and entities signing this Note are jointly and severally liable.

B.     Borrower waives all suretyship defenses.

C.     Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.     Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.     Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.     If any part of this Note is unenforceable, all other parts remain in effect.

G.     To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10.    STATE-SPECIFIC PROVISIONS:

BORROWER HEREBY EXPRESSLY (A) WAIVES ANY RIGHTS IT MAY HAVE UNDER CALIFORNIA CIVIL CODE SECTION 2954.10 TO PREPAY THIS NOTE, IN WHOLE OR IN PART, WITHOUT PENALTY, UPON ACCELERATION OF THE MATURITY OF THIS NOTE, AND (B) AGREES THAT IF A PREPAYMENT OF ANY OR ALL OF THIS NOTE IS MADE, FOLLOWING ANY ACCELERATION OF THE MATURITY OF THIS NOTE BY THE HOLDER HEREOF ON ACCOUNT OF ANY TRANSFER OR DISPOSITION AS PROHIBITED OR RESTRICTED BY THE DEED OF TRUST, THEN BORROWER SHALL BE OBLIGATED TO PAY, CONCURRENTLY THEREWITH, AS A PREPAYMENT FEE, THE APPLICABLE SUM SPECIFIED IN PARAGRAPH 5, ABOVE. BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, THE UNDERSIGNED HEREBY DECLARES THAT LENDER'S AGREEMENT TO MAKE THE SUBJECT LOAN AT THE INTEREST RATE AND FOR THE TERM SET FORTH IN THIS NOTE CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY THE UNDERSIGNED, FOR THIS WAIVER AND AGREEMENT.

BORROWER'S INITIALS: _____

CONFESSION OF JUDGMENT. THE UNDERSIGNED HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY-AT-LAW TO APPEAR IN ANY COURT OF RECORD AND TO CONFESS JUDGMENT AGAINST THE UNDERSIGNED FOR THE UNPAID AMOUNT OF THE NOTE AS EVIDENCED BY AN AFFIDAVIT SIGNED BY AN OFFICER OF LENDER SETTING FORTH THE AMOUNT THEN DUE, TOGETHER WITH ALL INDEBTEDNESS PROVIDED FOR THEREIN (WITH OR WITHOUT ACCELERATION OF MATURITY), PLUS ATTORNEYS' FEES OF TEN PERCENT (10%) OF THE TOTAL INDEBTEDNESS OR FIVE THOUSAND DOLLARS ($5,000.00), WHICHEVER IS THE LARGER AMOUNT FOR THE COLLECTION, WHICH GUARANTOR AND LENDER AGREE IS REASONABLE, PLUS COSTS OF SUIT, AND TO RELEASE ALL ERRORS, AND WAIVE ALL RIGHTS OF APPEAL. THE UNDERSIGNED EXPRESSLY RELEASES ALL ERRORS, WAIVES ALL STAY OF EXECUTION, RIGHTS OF INQUISITION AND EXTENSION UPON ANY LEVY UPON REAL ESTATE AND ALL EXEMPTION OF PROPERTY FROM LEVY AND SALE UPON ANY EXECUTION HEREON; AND THE UNDERSIGNED EXPRESSLY AGREES TO CONDEMNATION AND EXPRESSLY RELINQUISHES ALL RIGHTS TO BENEFITS OR EXEMPTIONS UNDER ANY AND ALL EXEMPTION LAWS NOW IN FORCE OR WHICH MAY HEREAFTER BE ENACTED. NO SINGLE EXERCISE OF THE FOREGOING WARRANT AND POWER TO CONFESS JUDGMENT WILL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT ANY SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, VOIDABLE OR VOID; BUT THE POWER WILL CONTINUE UNDIMINISHED AND MAY BE EXERCISED FROM TIME TO TIME AS LENDER MAY ELECT UNTIL ALL AMOUNTS OWING ON THIS NOTE HAVE BEEN PAID IN FULL. THE UNDERSIGNED HEREBY WAIVES AND RELEASES ANY AND ALL CLAIMS OR CAUSES OF ACTION WHICH THE UNDERSIGNED MIGHT HAVE AGAINST ANY ATTORNEY ACTING UNDER THE TERMS OF AUTHORITY WHICH THE UNDERSIGNED HAS GRANTED HEREIN ARISING OUT OF OR CONNECTED WITH THE CONFESSION OF JUDGMENT HEREUNDER.

11.    BORROWER'S NAME AND SIGNATURE:

By signing below, each individual or entity becomes obligated under this Note as Borrower.

GRDN HOSPITALITY, LLC

By: _____

Lynne Miwa Weaver, Manager

Borrower:    GRDN HOSPITALITY, LLC

Lender:      Live Oak Banking Company

Date:        9/22/2c

### DISCLOSURE FOR CONFESSION OF JUDGMENT

I have executed a Promissory Note (the "Note") in the original amount of $2,520,000.00 obligating Borrower to repay that amount.

Initials: _____

I understand that the Note contains wording that would permit Wilmington Savings Fund Society, FSB to enter judgment against Borrower in Court, without advance notice to Borrower and without offering Borrower an opportunity to defend against the entry of judgment, and that the judgment may be collected immediately by any legal means.

Initials: _____

In executing the Note, Borrower is knowingly, understandingly and voluntarily waiving its rights to resist the entry of judgment against it at the courthouse, including any right to advance notice of the entry of, or execution upon, said judgment, and Borrower is consenting to the confession of judgment.

Initials: _____

I certify that Borrower's annual income exceeds $10,000.00; that the blanks in this disclosure were filled in when I initialed and signed; and that I received a copy at the time of signing.

GRDN HOSPITALITY, LLC

By: _____
Lynne Miwa Weaver, Manager

Signed, acknowledged and delivered in the presence of:

_____
Witness    Nardo G. Carrion Jr

{04056548;v1 }
SBA Form 147 (06/03/02) Version 4.1

# U.S. Small Business Administration
## Settlement Sheet

OMB APPROVAL NO.: 3245-0200
EXPIRATION DATE: 04/30/2022

| SBA Loan Number | Lender Name | Lender FIRS Number |
|---|---|---|
| PLP 43046191-09 | Live Oak Banking Company | 7080642 |

| SBA Loan Name | Note Amount |
|---|---|
| Three Weavers Brewing Company | $2,520,000.00 |

**Loan Type:** [X] Term Loan  [ ] Line of Credit    **Disbursement Type:** [X] First Disbursement  [ ] Subsequent Disbursement  [] Full Disbursement

| Authorized Use of Proceeds: | Name of Payee: | Amount Disbursed: | Authorized Amount Remaining: |
|---|---|---|---|
| Land Acquisition: [ ] Raw [ ] Improved | | $0.00 | $0.00 |
| Construction: [ ] New [ ] Expansion/Renovation | | $0.00 | $0.00 |
| Leasehold Improvements to property owned by others | | $0.00 | $0.00 |
| Machinery & Equipment | See attached Settlement Statement | $427,040.10 | $677,959.90 |
| Furniture & Fixtures | | $0.00 | $0.00 |
| Inventory Purchase | | $0.00 | $0.00 |
| Working Capital | | $0.00 | $0.00 |
| Acquire Business (Change of Ownership) | | $0.00 | $0.00 |
| SBA Guarantee Fee | Small Business Administration | $72,125.00 | $0.00 |
| Working capital and closing costs | See attached Settlement Statement | $217,424.08 | $0.00 |
| Other (Explain): Refinance Short Term Business Loan | Zions Bancorporation, N.A. | $1,125,450.92 | $0.00 |
| (FOR ADDITIONAL DETAIL, SEE ATTACHED SETTLEMENT STATEMENT) | Total: | $1,842,040.10 | $677,959.90 |

| Borrower's Injection (including any deposit or earnest money): | | |
|---|---|---|
| Cash | Source: | $0.00 |
| Assets | Source: | $0.00 |
| Seller contribution toward required equity (on full standby for life of loan) | | $0.00 |
| Other (Explain): | | $0.00 |
| | Total Borrower Injection: | $ 0.00 |

At the time of completion of this form, the Lender and the Borrower certify that:

1. The loan proceeds were disbursed and received and will be used in accordance with the Use of Proceeds section of the Authorization, including any and all SBA/Lender approved modifications, and that all required equity or Borrower injections have been made in accordance with the Authorization and any approved modifications; and

2. There has been no unremedied adverse change in the Borrower's or Operating Company's financial condition, organization, management, operations or assets since the date of application that would warrant withholding or not making this disbursement or any further disbursement.

**At the time of each subsequent disbursement on this loan, the Lender, by disbursing the loan proceeds, and the Borrower by receiving them, are deemed to certify that the above certifications are true with respect to each and every disbursement made.**

**WARNING:** By signing below you are certifying that the above statements are accurate to the best of your knowledge. Submitting false information to the Government may result in criminal prosecution and fines up to $250,000 and/or imprisonment for up to 5 years under 18 USC § 1001. Submitting false statements to a Federally insured institution may result in fines up to $1,000,000 and/or imprisonment for up to 30 years under 18 USC § 1014, penalties under 15 USC § 645, and/or civil fraud liability.

| Authorized Lender Official | Borrower |
|---|---|
| Signature: | Signature: *[signature]* |
| Print Name: | Print Name: Lynne Miwa Weaver |
| Title: | Title: Manager |
| Date: | Date: 9/22/22 |

SBA Form 1050 (04-19) Previous Editions Obsolete

NOTE: According to the Paperwork Reduction Act, you are not required to respond to this collection of information unless it displays a currently valid OMB Control Number. The estimated burden for completing this form, including time for reviewing instructions, and gathering data needed, is 30 minutes. Comments or questions on the burden estimates or other aspects of this information collection should be sent to U.S. Small Business Administration, Director, RMD, 409 3rd St., SW, Washington DC 20416 and/or SBA Desk Officer, Office of Management and Budget, New Executive Office Building, Rm. 10202, Washington DC 20503. **PLEASE DO NOT SEND THE COMPLETED FORMS TO THESE ADDRESSES.**

{04056545;v1 }

# EXHIBIT B



U.S. Small Business Administration

# NOTE

| | |
|---|---|
| SBA Loan # | PLP 43045791-10 |
| SBA Loan Name | Three Weavers Brewing Company |
| Date | |
| Loan Amount | $200,000.00 |
| Interest Rate | Wall Street Journal Prime Rate plus 2.00% |
| Borrower | GRDN HOSPITALITY, LLC |
| Operating Company | N/A |
| Lender | Live Oak Banking Company |

1.    **PROMISE TO PAY:**

In return for the Loan, Borrower promises to pay to the order of Lender the amount of Two Hundred Thousand Dollars,  interest on the unpaid principal balance, and all other amounts required by this Note.

2.    **DEFINITIONS:**

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or  entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

{04056752;v1 }

3.    PAYMENT TERMS:

Maturity: This Note will mature in 10 years from date of Note.

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate on this Note will fluctuate. The initial interest rate is 7.50% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 2.00%. The interest rate on this Note will then begin to fluctuate as described below. The initial interest rate must remain in effect until the first change period begins unless changed in accordance with SOP 50 10.

Borrower must pay a total of 60 payments of interest only on the disbursed principal balance beginning 2 months from the month this Note is dated; payments must be made on the fifth calendar day in the months they are due.

Borrower must pay principal and interest payments every month, beginning 62 months from the month this Note is dated; payments must be made on the fifth calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will initially be adjusted on October 1, 2022 and then adjust every calendar quarter thereafter (the "Change Period").

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or the first day of the month in which any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 2.00% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

The interest rate adjustment period may only be changed in accordance with SOP 50 10.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

**Borrower may Prepay this Note.** Borrower may prepay 20% or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20% and the Loan has been sold on the secondary market, Borrower must:

a.     Give Lender written notice;
b.     Pay all accrued interest; and
c.     If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under

subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 10 years from date of Note.

**Late Charge:** If a payment on this Note is more than 15 days late, Lender may charge Borrower a late fee of up to 4.00% of the unpaid portion of the regularly scheduled payment.

4.    DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A.    Fails to do anything required by this Note and other Loan Documents;

B.    Defaults on any other loan with Lender;

C.    Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D.    Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E.    Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F.    Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G.    Fails to pay any taxes when due;

H.    Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I.    Has a receiver or liquidator appointed for any part of their business or property;

J.    Makes an assignment for the benefit of creditors;

K.    Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L.    Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M.    Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5.    LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.    Require immediate payment of all amounts owing under this Note;

B.    Collect all amounts owing from any Borrower or Guarantor;

C.    File suit and obtain judgment;

D.    Take possession of any Collateral; or

E.    Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6.    LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.    Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B.    Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property

taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C.    Release anyone obligated to pay this Note;

D.    Compromise, release, renew, extend or substitute any of the Collateral; and

E.    Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7.    WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8.    SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9.    GENERAL PROVISIONS:

A.    All individuals and entities signing this Note are jointly and severally liable.

B.    Borrower waives all suretyship defenses.

C.    Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.    Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.    Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.    If any part of this Note is unenforceable, all other parts remain in effect.

G.    To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

11.    BORROWER'S NAME AND SIGNATURE:

By signing below, each individual or entity becomes obligated under this Note as Borrower.

GRDN HOSPITALITY, LLC

By: _____
Lynne Miwa Weaver, Manager

10.    STATE-SPECIFIC PROVISIONS:

BORROWER HEREBY EXPRESSLY (A) WAIVES ANY RIGHTS IT MAY HAVE UNDER CALIFORNIA CIVIL CODE SECTION 2954.10 TO PREPAY THIS NOTE, IN WHOLE OR IN PART, WITHOUT PENALTY, UPON ACCELERATION OF THE MATURITY OF THIS NOTE, AND (B) AGREES THAT IF A PREPAYMENT OF ANY OR ALL OF THIS NOTE IS MADE, FOLLOWING ANY ACCELERATION OF THE MATURITY OF THIS NOTE BY THE HOLDER HEREOF ON ACCOUNT OF ANY TRANSFER OR DISPOSITION AS PROHIBITED OR RESTRICTED BY THE DEED OF TRUST, THEN BORROWER SHALL BE OBLIGATED TO PAY, CONCURRENTLY THEREWITH, AS A PREPAYMENT FEE, THE APPLICABLE SUM SPECIFIED IN PARAGRAPH 5, ABOVE.  BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, THE UNDERSIGNED HEREBY DECLARES THAT LENDER'S AGREEMENT TO MAKE THE SUBJECT LOAN AT THE INTEREST RATE AND FOR THE TERM SET FORTH IN THIS NOTE CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY THE UNDERSIGNED, FOR THIS WAIVER AND AGREEMENT.

BORROWER'S INITIALS:

CONFESSION OF JUDGMENT.  THE UNDERSIGNED HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY-AT-LAW TO APPEAR IN ANY COURT OF RECORD AND TO CONFESS JUDGMENT AGAINST THE UNDERSIGNED FOR THE UNPAID AMOUNT OF THE NOTE AS EVIDENCED BY AN AFFIDAVIT SIGNED BY AN OFFICER OF LENDER SETTING FORTH THE AMOUNT THEN DUE, TOGETHER WITH ALL INDEBTEDNESS PROVIDED FOR THEREIN (WITH OR WITHOUT ACCELERATION OF MATURITY), PLUS ATTORNEYS' FEES OF TEN PERCENT (10%) OF THE TOTAL INDEBTEDNESS OR FIVE THOUSAND DOLLARS ($5,000.00), WHICHEVER IS THE LARGER AMOUNT FOR THE COLLECTION, WHICH GUARANTOR AND LENDER AGREE IS REASONABLE, PLUS COSTS OF SUIT, AND TO RELEASE ALL ERRORS, AND WAIVE ALL RIGHTS OF APPEAL.  THE UNDERSIGNED EXPRESSLY RELEASES ALL ERRORS, WAIVES ALL STAY OF EXECUTION, RIGHTS OF INQUISITION AND EXTENSION UPON ANY LEVY UPON REAL ESTATE AND ALL EXEMPTION OF PROPERTY FROM LEVY AND SALE UPON ANY EXECUTION HEREON; AND THE UNDERSIGNED EXPRESSLY AGREES TO CONDEMNATION AND EXPRESSLY RELINQUISHES ALL RIGHTS TO BENEFITS OR EXEMPTIONS UNDER ANY AND ALL EXEMPTION LAWS NOW IN FORCE OR WHICH MAY HEREAFTER BE ENACTED.  NO SINGLE EXERCISE OF THE FOREGOING WARRANT AND POWER TO CONFESS JUDGMENT WILL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT ANY SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, VOIDABLE OR VOID; BUT THE POWER WILL CONTINUE UNDIMINISHED AND MAY BE EXERCISED FROM TIME TO TIME AS LENDER MAY ELECT UNTIL ALL AMOUNTS OWING ON THIS NOTE HAVE BEEN PAID IN FULL.  THE UNDERSIGNED HEREBY WAIVES AND RELEASES ANY AND ALL CLAIMS OR CAUSES OF ACTION WHICH THE UNDERSIGNED MIGHT HAVE AGAINST ANY ATTORNEY ACTING UNDER THE TERMS OF AUTHORITY WHICH THE UNDERSIGNED HAS GRANTED HEREIN ARISING OUT OF OR CONNECTED WITH THE CONFESSION OF JUDGMENT HEREUNDER.

Borrower:    GRDN HOSPITALITY, LLC

Lender:      Live Oak Banking Company

Date:        9/22/22

## DISCLOSURE FOR CONFESSION OF JUDGMENT

I have executed a Promissory Note (the "Note") in the original amount of $200,000.00 obligating Borrower to repay that amount.

Initials: _____

I understand that the Note contains wording that would permit Wilmington Savings Fund Society, FSB to enter judgment against Borrower in Court, without advance notice to Borrower and without offering Borrower an opportunity to defend against the entry of judgment, and that the judgment may be collected immediately by any legal means.

Initials: _____

In executing the Note, Borrower is knowingly, understandingly and voluntarily waiving its rights to resist the entry of judgment against it at the courthouse, including any right to advance notice of the entry of, or execution upon, said judgment, and Borrower is consenting to the confession of judgment.

Initials: _____

I certify that Borrower's annual income exceeds $10,000.00; that the blanks in this disclosure were filled in when I initialed and signed; and that I received a copy at the time of signing.

GRDN HOSPITALITY, LLC

By: _____
    Lynne Miwa Weaver, Manager

Signed, acknowledged and delivered in the presence of:

_____
Witness

{04056752;v1 }
SBA Form 147 (06/03/02) Version 4.1

# SECURITY AGREEMENT - COMMERCIAL

This Security Agreement - Commercial ("**Security Agreement**") is executed, made and delivered on
09-22-2022 by GRDN HOSPITALITY, LLC (herein the "**Debtor and/or Borrower**"), whose address is
1031 W. Manchester Boulevard, Unit A-E, Inglewood, CA 90301-1563, for the benefit of Live Oak Banking
Company (the "**Secured Party**"), whose address is 1741 Tiburon Drive, Wilmington, NC 28403.

FOR VALUE RECEIVED, the receipt, adequacy and sufficiency of which are hereby acknowledged,
Debtor grants to Secured Party the security interest (and the pledges and assignments as applicable) hereinafter set
forth and agrees with Secured Party as follows:

**A.**    **OBLIGATIONS SECURED.**  The security interest and pledges and assignments, as applicable,
granted hereby are to secure the punctual payment and performance of the following (i) a certain promissory note of
even date herewith in the original principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00)
from the Borrower and payable to the order of Secured Party (the "**Note**"), and any and all extensions, renewals,
modifications and rearrangements thereof; and (ii) any and all other indebtedness, liabilities and obligations
whatsoever of Debtor to Secured Party whether direct or indirect, absolute or contingent, primary or secondary, due
or to become due and whether now existing or hereafter arising and howsoever evidenced or acquired, whether joint
or several, or joint and several (all of which are herein separately and collectively referred to as the "**Obligations**").
Debtor acknowledges that the security interest hereby granted shall secure all future advances as well as any and all
other indebtedness, liabilities and obligations of Debtor to Secured Party whether now in existence or hereafter
arising.

**B.**    **USE OF COLLATERAL.**  Debtor represents, warrants and covenants that the Collateral will be
used by the Debtor primarily for business, commercial, or other similar purposes.

**C.**    **DESCRIPTION OF COLLATERAL.**  Debtor hereby grants to Secured Party a security interest
in (and hereby pledges and assigns as applicable) and agrees that Secured Party shall continue to have a security
interest in (and a pledge and assignment of, as applicable), the following property:

**All Accounts.**  A security interest in all accounts now owned or existing as well as any and all that may
hereafter arise or be acquired by Debtor, and all the proceeds and products thereof, including without
limitation, all notes, drafts, acceptances, instruments and chattel paper arising therefrom, and all returned or
repossessed goods arising from or relating to any which accounts, or other proceeds of any sale or other
disposition of inventory, together with any documents evidencing and or relating to the Accounts and any
security for Accounts, books and/or records.

**All Inventory.**  A security interest in all of Debtor's inventory, including all goods, merchandise, raw
materials, goods in process, finished goods and other tangible personal property, wheresoever located, now
owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts for
service or used or consumed in Debtor's business, and all additions and accessions thereto, and all leases
and contracts with respect thereto, and all documents of title evidencing or representing any part thereof,
and all products and proceeds thereof, whether in the possession of the Debtor, warehouseman, bailee, or
any other person.

**All Equipment, Furniture, and other Tangible Property.**  A security interest in all equipment, furniture,
and other tangible property of every nature and description whatsoever, now owned or hereafter acquired
by Debtor, including all appurtenances and additions thereto, and substitutions therefor and replacement
thereof, wheresoever located, including all tools, parts and accessories used in connection therewith and the
rights of the Debtor under any manufacturer's warranties relating to the foregoing, including but not limited
to the collateral listed on Exhibit "A" attached hereto.

**General Intangibles.**  A security interest in all general intangibles and other personal property now owned
or hereafter acquired by Debtor other than goods, accounts, chattel paper, documents or instruments,

including without limitation, all payment intangibles and any personal property, causes of action, goodwill, tax refunds, licenses, franchises, trademarks, tradenames, servicemarks, copyrights, customer lists, patents, and all rights under any license agreements for use of the same, as well as all domain names, domain rights, information to access and maintain information stored within third party managed servers, social media accounts, social media advertising accounts, electronic files and websites hosting the same.

**Chattel Paper.** A security interest in all of Debtor's interest under chattel paper, lease agreements and other instruments or documents (whether tangible or electronic), whether now existing or owned by Debtor or hereafter arising or acquired by Debtor, evidencing both a debt and security interest in or lease of specific goods.

**Instruments.** A pledge and assignment of and security interest in all of Debtor's Instruments, including without limitation, all promissory notes and all certificates, securities and all certificates of deposit, now owned or existing as well as hereafter acquired or arising instruments and documents.

**Deposit Accounts and Other Property.** Debtor hereby grants to Secured Party a security interest in, and a pledge and assignment of, any and all money, property, deposit accounts, lock boxes, certificates of deposit, investment accounts, accounts, securities, documents (including bills of lading), commercial paper, chattel paper, claims, demands, instruments, items or deposits of the Debtor, and each of them, or to which any of them is a party, now held or hereafter coming within Secured Party's custody or control, whether such have matured or the exercise of Secured Party's rights results in loss of interest or principal or other penalty on such deposits, but excluding deposits subject to tax penalties if assigned. Without prior notice to or demand upon the Debtor, Secured Party may exercise its rights granted above at any time when a default has occurred or Secured Party deems itself insecure. Secured Party's rights and remedies under this paragraph shall be in addition to and cumulative of any other rights or remedies at law and equity, including, without limitation, any rights of set-off to which Secured Party may be entitled.

The term "**Collateral**" as used in this Agreement shall mean and include, and the security interest (and pledge and assignment as applicable) shall cover, all of the foregoing property, including without limitation, a purchase money security interest in all inventory and equipment acquired by financing provided by the Secured Party, as well as any accessions, additions and attachments thereto, and the proceeds and products thereof, including without limitation, all cash, general intangibles, accounts, inventory, equipment, fixtures, farm products, notes, drafts, acceptances, securities, instruments, chattel paper, insurance proceeds payable because of loss or damage, or other property, benefits or rights arising therefrom, and in and to all returned or repossessed goods arising from or relating to any of the property described herein or other proceeds of any sale or other disposition of such property (including, without limitation, whatever is received upon the use, lease, sale, exchange, collections, any other utilization, or any disposition of any of the foregoing property, whether cash or non-cash, all rental or lease payments, accounts, chattel paper, instruments, documents, contract rights, general intangibles, machinery, equipment, inventory, substitutions, additions, accessions, replacements, products, and renewals of, for, or to such property, and all insurance therefor).

    **D.**    <u>**REPRESENTATIONS, WARRANTIES AND COVENANTS OF DEBTOR.**</u> Debtor represents and warrants as follows:

    1.    **Ownership; No Encumbrances.** Except for the security interest (and pledges and assignments as applicable) granted hereby and that senior security interest in Secured Party to secured that certain SBA 7a loan in the original principal amount of $2,520,000.00 (the "**Permitted Encumbrances**"), the Debtor is, and as to any property acquired after the date hereof which is included within the Collateral, Debtor will be, the owner of all such Collateral free and clear from all charges, liens, security interests, adverse claims and encumbrances of any and every nature whatsoever.

    2.    **No Financing Statements.** Except for the Permitted Encumbrances, there is no financing statement or similar filing now on file in any public office covering any part of the Collateral, and Debtor will not execute and there will not be on file in any public office any financing statement or similar filing except the financing statements filed or to be filed in favor of, or assigned or to be assigned on the date hereof to, Secured Party.

# EXHIBIT C

| Week starting | 7/24/25 | 7/28/25 | 8/4/25 | 8/11/25 | 8/18/25 | 8/25/25 |
|---|---|---|---|---|---|---|
| Income | | | | | | |
| Tasting Room | $10,000.00 | $16,000.00 | $16,000.00 | $16,000.00 | $16,000.00 | $16,000.00 |
| Distribution | | $13,436.50 | $17,133.30 | $11,123.80 | $12,872.80 | $16,561.40 |
| Customer-DS | | | $5,556.60 | | | |
| Customer-SD | | | | | | |
| Customer-Pks | | | | $6,300.00 | | |
| Total Income | $10,000.00 | $29,436.50 | $38,689.90 | $33,423.80 | $28,872.80 | $32,561.40 |
| Cost Of Goods Sold | | | | | | |
| BSG | | $1,700.00 | | $2,500.00 | | $2,500.00 |
| CLS Farms | | | $1,700.00 | | $1,700.00 | |
| Yakima Valley Hops | | | $1,700.00 | | $1,700.00 | |
| Saxco | | | $3,000.00 | | | |
| Coastal Carbonics | | $2,200.00 | | | | |
| Zee Chemicals | | | $2,500.00 | | | |
| Microstar | | | $4,960.82 | | | |
| Blue Label | | | | | $5,000.00 | $3,200.00 |
| Eurofins | | | | | $250.00 | |
| Total Cost Of Goods Sold | $0.00 | $3,900.00 | $13,860.82 | $2,500.00 | $8,650.00 | $5,700.00 |
| Net Weekly Income Before Tax & Expense | $10,000.00 | $25,536.50 | $24,829.08 | $30,923.80 | $20,222.80 | $26,861.40 |
| Expenses | | | | | | |
| Office Expense | | $50.00 | $210.00 | $1,250.00 | $50.00 | $50.00 |
| Sales Expense | | $558.00 | | $700.00 | $558.00 | |
| General Commercial Insurance & Umbrella | | $1,505.00 | | | | |
| Property Insurance (Deposit and 1st month Due) | | $6,700.00 | | | | |
| Workers Comp | | $1,000.00 | | | | $1,000.00 |
| Health Insurance | $8,250.00 | | | | $8,250.00 | |
| Dues and Subscriptions | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 |
| Telephone | | | | | | $50.00 |
| Utility-Southern California Edison | | | $10,000.00 | | | |
| Utility-So Cal Gas | | | $2,900.00 | | | |
| Utility-Inglewood Water | | | 900 | | | |
| Inglewood Business Tax (2023, 2024, 2025) | | | $4,170.35 | $1,656.66 | | |
| Sales Tax | | $1,600.00 | $1,600.00 | $1,600.00 | $1,600.00 | $1,600.00 |
| Payroll & 401k | | $4,500.00 | | $24,000.00 | | $24,000.00 |
| Payroll Tax | | $8,900.00 | $4,000.00 | | $8,000.00 | |
| Credit Card Payment | | | | $1,500.00 | $1,250.00 | |
| Bank Fees | | | | | $200.00 | |
| Payroll Fees | | $275.00 | | | | |
| Total Expenses | $8,400.00 | $24,963.00 | $23,930.35 | $30,856.66 | $20,058.00 | $26,850.00 |
| Net Operating Income | $1,600.00 | $573.50 | $898.73 | $67.14 | $164.80 | $11.40 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

10100 N. Santa Monica Boulevard, Suite 1450, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (specify): __Emergency Motion for Authority to Use Cash Collateral on An Interim and Final Basis; Declaration of Nicole Torres In Support Thereof; Exhibits_____will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) **7/28/2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

    See Attached Service List

                        [ X ] Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:**
On (date)__**7/28/2025**____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

    See Attached Mailing List

                        [ X ] Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) _____ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

                        [ ]Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 7/28/2025 | Suzanne Johnson | /s/ Suzanne Johnson |
|---|---|---|
| _Date_ | _Printed Name_ | _Signature_ |

    This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

### ***SERVICE LIST***

**2:25-bk-16321-DS Notice will be electronically mailed to:**

*Moriah Douglas ("Doug") Flahaut (TR)*
*df@echoparklegal.com, C194@ecfcbis.com*

*Gregory K Jones on behalf of Debtor GRDN Hospitality, LLC*
*gjones@stradlinglaw.com, smjohnson@sycr.com;smjohnson@stradlinglaw.com*

*Noreen A Madoyan on behalf of U.S. Trustee United States Trustee (LA)*
*Noreen.Madoyan@usdoj.gov*

*United States Trustee (LA)*
*ustpregion16.la.ecf@usdoj.gov*

### ***MAILING LIST***

Airgas National Carbonation
PO Box 734673
Dallas, TX 75373-4673

Anthem Health Ins
Anthem Blue Cross
PO Box 659960
San Antonio, TX 78265-9146

Blue Label
3750 Lancaster New Lexington Rd SE
Lancaster, OH 43130

California Department of Tax
and Fee Administration
PO Box 942879
Sacramento, CA 94279-0055

City of Inglewood
PO Box 743543
Los Angeles, CA 90074-3543

CLS Farms
7810 Robillard Road
Moxee, WA 98936

D & D Engineering
119 W Hyde Park Blvd
Inglewood, CA 90302

Fer studio
Attn Fer studio
1159 East Hyde Park Blvd
Inglewood, CA 90302

First Rate Electric
Attn Neville Milburn
5608 Clearsite St
Torrance, CA 90505-3254

John I. Haas
Attn 3W  Chris
1600 River Road
Yakima, WA 98902

KHS USA Inc
PO Box 681014
Chicago, IL 60695-2014

Live Oak Bank
Attn Keilah Spooner Assoc SA OfcSBB
1757 Tiburon Drive
Wilmington, NC 28403

Los Angeles County Tax Collector
Attn Bankruptcy Unit
PO Box 54110
Los Angeles, CA 90054-0110

Lyneer Staffing
PO Box 88911
Milwaukee, WI 53288-8911

Manchester Business Park
8740 S Sepulveda Blvd
Ste 100
Los Angeles, CA 90045

MUN CPAs
2901 Douglas Blvd
Ste 290
Roseville, CA 95661

Pneumatic Scale Angelus
25236 Network Place
Chicago, IL 60673-1252

Saxco
PO Box 848701
Los Angeles, CA 90084-8701

Systems Interface Inc
10802 47th Ave W
Mukilteo, WA 98275

Yakima Chief Hops LLC
Attn YCH Orders
306 Division St
Yakima, WA 98902

*Zee Company Inc*
*412 Georgia Ave Ste 300*
*Chattanooga, TN 37403*


*Zion Packaging (formerly Aluminati)*
*1695 California Avenue*
*Corona, CA 92881*

*Doug Flahaut*
*2210 W. Sunset Blvd., #301*
*Los Angeles, CA 90026*